BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS KASPAR, Derivatively on Behalf of Nominal Defendant ORIGIN MATERIALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOHN BISSELL, PIA HEIDENMARK COOK, KATHLEEN B. FISH, WILLIAM HARVEY, CRAIG A. ROGERSON, JIM STEPHANOU, R. TONY TRIPENY, RICH RILEY, KAREN RICHARDSON, BENNO O. DORER, and CHARLES DRUCKER, <br><br> Defendants, <br><br> and <br><br> ORIGIN MATERIALS, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

## **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Thomas Kaspar ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Origin Materials, Inc. ("Origin" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Origin, legal filings, news reports, securities analysts' reports about the Company, the securities class action *In re Origin Materials, Inc. Securities Litigation,* Case No. 2:23-cv-01816-WBS-JDP (E.D. Cal.), and other publicly available information.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought by Plaintiff on behalf of Origin against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least February 23, 2023 and August 9, 2023, inclusive (the "Relevant Period"), and for violations of the federal securities laws, as set forth below.

2.     Origin is a company specializing in developing and commercializing sustainable materials to replace traditional petroleum-based materials used in various industries. The Company purports to utilize a proprietary technology to convert biomass into environmentally-friendly alternatives to conventional plastics for use in food and beverage packaging, textiles, adhesives, and other applications.

3.     Origin produces various chemicals, including a carbon-negative chloromethylfurfural ("CMF"), which can be converted into, *inter alia*: (i) paraxylene ("PX"), a material that can replace non-sustainable chemicals used in the production of polyethylene terephthalate ("PET"), which is widely used in textiles and plastic bottles; and (ii) furandicarboxylic

acid ("FDCA"), a chemical which can be used to produce polyethylene furanoate ("PEF"), a biobased alternative to PET.

4.    PET is one of the most widely used and recycled plastics in the world. Accordingly, the Company has touted the potentially vast market for an environmentally-friendly process for the production of PET.

5.    Prior to the start of the Relevant Period, on February 17, 2021, the Company announced its intention to invest in two substantial capital projects. Specifically, the Company would be building two commercial-scale plants, referred to as "Origin 1" and "Origin 2." Origin 1 was expected to be operational by the end of 2022. Origin 2, a significantly larger manufacturing plant, was expected to be operational by mid-2025 and to supply the majority of the Company's products from 2025 until 2027.

6.    The Company represented that it did not anticipate reaching commercial scale production or generating positive earnings before interest, taxes, depreciation, and amortization ("EBITDA") until 2025, when Origin was expected to become operational. Accordingly, the completion of Origin 2 was central to the Company's growth prospects.

7.    Throughout the Relevant Period, Company management repeatedly represented that the Company was progressing on-schedule with respect to the construction of Origin 2. Further, Company management consistently affirmed its commitment to primarily producing PET, derived from PX, at Origin 2.

8.    One former employee has reported, however, that Company management had been discussing internally, by early 2023 at the latest, that construction of Origin 2 would be significantly delayed and that Origin would be shifting focus away from the production of PET at Origin 2.

9.    The account of this former employee is confirmed by a partnership agreement that Origin entered into with Avantium N.V. ("Avantium"), a leading producer of FDCA. In February 2023, the Company entered into a partnership agreement with Avantium to accelerate production of FDCA, instead of PET, at Origin 2. The account of the former employee is further corroborated by amendments to the Company's partnership agreement with PepsiCo, Inc. ("Pepsi"), which indicated,

among other things, that operations at Origin 2 could be delayed.

10.     Despite this, Company management continued to represent publicly that the Company was committed to focusing on PX production at Origin 2 and that construction of Origin 2 was progressing on schedule and would be operational by mid-2025.

11.     Indeed, it was not until August 9, 2023 that Company management would finally reveal that Origin 2 would no longer produce PET derived from PX and would instead focus on producing PEF derived from FDCA. That day, the Individual Defendants would further disclose that Origin 2's construction would be significantly delayed. Specifically, construction of Origin 2 would be broken up into two phases, with phase 1 expected to be operational by late-2026 or 2027 and phase 2 expected to be operational by 2028.

12.     On this news, the price of Origin stock declined 66.5% in one day, from a close of $4.33 per share on August 9, 2023 to a close of $1.45 per share on August 10, 2023.

13.     As the market continued to digest the news, the price of Origin stock declined further, closing at just $0.99 per share on October 31, 2023, an additional 68% decline from the stock's August 10, 2023 closing price.

14.     As a result of the foregoing, the Securities Class Action was filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

15.     In light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9).

17.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

19.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

20.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Origin is headquartered in this District, Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

*Plaintiff*

21.    Plaintiff is, and has been at all relevant times, a shareholder of Origin.

*Nominal Defendant*

22.    Nominal Defendant Origin is incorporated under the laws of Delaware with its principal executive offices located at 930 Riverside Parkway, Suite 10, West Sacramento, California 95605. Origin's common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "ORGN."

*Individual Defendants*

23.    Defendant John Bissell ("Bissell") co-founded Origin in November 2008 and serves as its Co-Chief Executive Officer ("CEO"). Defendant Bissell has served as a member of the Board and as either CEO or Co-CEO of the Company since its inception. Defendant Bissell is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant

Bissell received $810,567 in 2023 in compensation from the Company. As of March 4, 2024, Defendant Bissell beneficially owned 1,899,071 shares of Origin common stock, worth roughly $1.1 million[1] and constituting 1.3% of the Company's total outstanding shares.

24.    Defendant Pia Heidenmark Cook ("Cook") has served as a member of the Board since June 2021 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Cook received $65,000 in 2023 in compensation from the Company. As of March 4, 2024, Defendant Cook beneficially owned 64,035 shares of Origin common stock, worth $38,549.

25.    Defendant Kathleen B. Fish ("Fish") has served as a member of the Board since June 2021. According to the Company's public filings, Defendant Fish received $198,761 in 2023 in compensation from the Company. As of March 4, 2024, Defendant Fish beneficially owned 186,236 shares of Origin common stock, worth $112,114.

26.    Defendant William J. Harvey ("Harvey") has served as a member of the Board since June 2017 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Harvey received $204,997 in 2023 in compensation from the Company. As of March 4, 2024, Defendant Harvey beneficially owned 237,470 shares of Origin common stock, worth $142,957.

27.    Defendant Craig A. Rogerson ("Rogerson") has served as a member of the Board since May 1, 2023 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Rogerson received $351,878 in 2023 in compensation from the Company.

28.    Defendant Jim Stephanou ("Stephanou") has served as a member of the Board since June 12, 2023 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Stephanou received $329,418 in 2023 in compensation from the Company.

29.    Defendant R. Tony Tripeny ("Tripeny") has served as a member of the Board since

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $.6020 per share closing price of Origin stock on March 4, 2024.

May 1, 2023 and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Tripeny received $358,554 in 2023 in compensation from the Company. As of March 4, 2024, Defendant Tripeny beneficially owned 73,000 shares of Origin common stock, worth $43,946.

***Former Director Defendants***

30.    Defendant Rich Riley ("Riley") served as Origin's Co-CEO and as a member of the Board from October 2020 until December 31, 2024. Prior to serving in those roles, Defendant Riley served as an advisor to and investor in Origin since 2010. Defendant Riley is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Riley received $915,657 in 2023 in compensation from the Company. As of March 4, 2024, Defendant Riley beneficially owned 3,001,427 shares of Origin common stock, worth roughly $1.8 million and constituting 2% of the Company's total outstanding shares.

31.    Defendant Karen Ann Richardson ("Richardson") served as Chair of the Board from June 2021 until March 1, 2024. According to the Company's public filings, Defendant Richardson received $254,999 in 2023 in compensation from the Company.

32.    Defendant Benno O. Dorer ("Dorer") served as a member of the Board from June 2021 until May 8, 2023.

33.    Defendant Charles Drucker ("Drucker") served as a member of the Board from June 2021 until February 1, 2024.

***Relevant Non-Parties***

34.    This action is based on Plaintiff's review, by counsel, of an extensive record of public documents as well as the Amended Class Action Complaint (the "Amended Complaint") in the Securities Class Action which contains detailed allegations based on interviews with a former Origin employee (referred to herein as FE 1) who provided information to plaintiffs' counsel in the Securities Class Action supporting the allegations in that case. This former employee provided information on a confidential basis and was described in the Amended Complaint with sufficient detail to establish his reliability and personal knowledge.

35.     FE 1 worked Origin prior to and throughout the Relevant Period as a technical development engineer. In that role, FE 1 worked on developing the technology used in converting CMF to PX at Origin 2. FE 1 worked with an internal engineering group at Origin. The group compiled chemistry data from the Company's Research and Development ("R&D") group and sending the data to Origin 1 for testing on a larger scale. After testing, the data would then be passed to the Company's external engineering firm as part of the planning and preparation for the construction of Origin 2.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

36.     By reason of their positions as officers and/or directors of Origin, and because of their ability to control the business and corporate affairs of Origin, the Individual Defendants owed Origin and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Origin in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Origin and its shareholders so as to benefit all shareholders equally.

37.     Each director and officer of the Company owes to Origin and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

38.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Origin, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

39.     To discharge their duties, the officers and directors of Origin were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

40.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the

Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Origin, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

41.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty: to ensure that Origin implemented and properly monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

42.     To discharge their duties, the officers and directors of Origin were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Origin were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Origin's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Origin conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Origin and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that Origin's publicly disclosed financial information would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

43.    Each of the Individual Defendants further owed to Origin and the shareholders the duty of loyalty requiring that each favor Origin's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

44.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Origin and were at all times acting within the course and scope of such agency.

45.    The Individual Defendants, because of their positions of control and authority, were

able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Origin.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

46.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

48.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

49.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Origin, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

50.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

51.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Origin and at all times acted within the course and scope

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of such agency.

## ORIGIN'S CODE OF CONDUCT

52.     Origin's Code of Conduct begins with a commitment to "the highest standards of business conduct and ethics."

53.     The Code of Conduct applies to "every employee, officer and director," and violations of the Code of Conduct may lead to "disciplinary action, which, depending on the nature of the violation and the history of the employee, may range from a warning or reprimand to and including termination of employment and, in appropriate cases, civil legal action or referral for regulatory or criminal prosecution."

54.     In a section titled "***Honest and Ethical Conduct***," the Code of Conduct states the following:

> It is the policy of the Company to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

55.     In a section titled "***Legal Compliance***," the Code of Conduct states the following:

> Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee's operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold periodic training sessions to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading (which are discussed in further detail in Section 3 below). While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Chief Compliance Officer (as further described in Section 16).

> Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including emails, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to

know and comply with our legal obligation.

56.     In a section titled "***Conflicts of Interest***," the Code of Conduct states the following, in pertinent part:

> We respect the rights of our employees to manage their personal affairs and investments and do not wish to impinge on their personal lives. At the same time, employees should avoid conflicts of interest that occur when their personal interests may interfere in any way with the performance of their duties or the best interests of the Company. A conflicting personal interest could result from an expectation of personal gain now or in the future or from a need to satisfy a prior or concurrent personal obligation. We expect our employees to be free from influences that conflict with the best interests of the Company or might deprive the Company their undivided loyalty in business dealings. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided.

57.     In a section titled "***Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting***," the Code of Conduct states the following, in pertinent part:

> The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:
>
> - no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;
>
> - transactions be supported by appropriate documentation;
>
> - the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;
>
> - employees comply with our system of internal controls; and

12

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with our Finance and Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

58.     With respect to Origin's corporate assets, the Code of Conduct states, in pertinent part, that "[a]ll employees are expected to protect our assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on our profitability."

## ORIGIN'S AUDIT COMMITTEE CHARTER

59.     Pursuant to Origin's Audit Committee Charter, the purpose of the Audit Committee is to:

[A]ct on behalf of the Board in fulfilling the Board's oversight responsibilities with respect to (i) the Company's corporate accounting and financial reporting processes,

systems of internal control over financial reporting and audits of financial statements, systems of disclosure controls and procedures, as well as the quality and integrity of the Company's financial statements and reports, (ii) the qualifications, independence and performance of the registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors"), (iii) the performance of the Company's internal audit function, and (iv) the review of any reports or other disclosure required by the applicable rules and regulations of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement and periodic reports within the scope of authority outlined herein.

60.    In a subsection titled "***Audited Financial Statement Review,***" the Audit Committee Charter states that the Audit Committee shall:

[R]eview, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and any disclosure from the Company's chief executive officer (or each chief executive officer, if there are more than one) and the chief financial officer to be made in connection with the certification thereof, and to recommend whether or not such financial statements should be so included.

61.    In a subsection titled "***Annual Audit Results,***" the Audit Committee Charter states that the Audit Committee shall:

[R]eview with management and the Auditors, the results of the annual audit, including the Auditors' assessment of the quality of the Company's accounting principles and practices, the Auditors' views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative GAAP methods on the financial statements), all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial), the adequacy of the disclosures in the financial statements, and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB.

62.    In a subsection titled "***Quarterly Results and Reports on Form 10-Q,***" the Audit Committee Charter states that the Audit Committee shall:

[R]eview with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements and any disclosure from the Company's chief executive officer (or each chief executive officer, if there are more than one) and the chief financial officer to be made in connection with the

certification of the Company's quarterly reports filed with the SEC, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB.

63.     With respect to the Company's press releases, the Audit Committee Charter states that the Audit Committee Charter shall:

[R]eview with management and the Auditors, to the extent appropriate, earnings press releases and earnings call script, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information), which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of this discussion.

64.     In a subsection titled "*Accounting Principles and Policies*," the Audit Committee states that the Audit Committee shall:

[R]eview with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under GAAP related to material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet structures and any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements, compliance programs and policies if, in the judgment of the Committee, such review is necessary or appropriate.

65.     With respect to the Company's risk assessment and risk management functions, the Audit Committee Charter states that the Audit Committee shall:

[R]eview and discuss with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to financial risk management and financial risk assessment, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures. Areas of focus shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks. To provide oversight of climate-related risks

and opportunities and monitoring the Company's compliance with ESG-related legal and regulatory requirements impacting the Company's accounting and financial reporting, including climate-related disclosures in the Company's financial statements. To review and discuss with management and the Auditors, as appropriate, the Company's non-financial risk exposures, including climate change, safety of the Company's manufacturing facilities, and cybersecurity risks.

66.     In a subsection titled "***Internal Control Over Financial Reporting; Disclosure Controls***," the Audit Committee Charter states that the Audit Committee shall:

[C]onfer with management and the Auditors, as appropriate, regarding the scope, adequacy, and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures, including any significant deficiencies and significant changes in internal controls. To obtain reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies, responsibilities, budget and staff of the internal audit function and review of the appointment or replacement of the senior internal audit executive or manager.

67.     In a subsection titled "***Ethical Compliance***," the Audit Committee Charter states that the Audit Committee shall:

[R]eview the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, as well as to its Code of Business Conduct and Ethics, including review and oversight of related-party transactions as required by applicable laws or requirements of any stock exchange on which any of the Company's capital stock is listed.

## SUBSTANTIVE ALLEGATIONS

***Background***

68.     Origin is a company specializing in developing and commercializing sustainable materials to replace traditional petroleum-based materials used in various industries. The Company purports to utilize a proprietary technology to convert biomass into environmentally-friendly alternatives to conventional plastics for use in food and beverage packaging, textiles, adhesives, and other applications.

69.     The Company uses non-food biomass, such as wood and agricultural residues, that

do not compete with food production, distinguishing it from other sustainable materials companies that use materials like vegetable oils or high fructose corn syrup in the production of bioplastics.

70.     Origin produces various chemicals, including a CMF, which can be converted into, *inter alia*: (i) PX, a material that can replace non-sustainable chemicals used in the production of PET, which is widely used in textiles and plastic bottles; and (ii) FDCA, a chemical which can be used to produce PEF, a biobased alternative to PET.

71.     The Company additionally produces other "building block" chemicals, including hydrothermal carbon ("HTC"), a form of carbon with applications in energy production and soil amendment products. Origin aims to produce these chemicals with a negative carbon footprint at a commercial scale.

72.     PET is one of the most widely used and recycled plastics in the world. Accordingly, the Company has touted the potentially vast market for an environmentally-friendly process for the production of PET.

73.     Origin has entered into strategic relationships with three of the world's largest consumers of PET: (i) Nestlé SA ("Nestlé"); (ii) Pepsi; and (iii) Danone S.A. ("Danone").

74.     Prior to the start of the Relevant Period, on February 17, 2021, the Company announced plans to go public via merger with a special purpose acquisition company. Origin further announced its intention to invest in two substantial capital projects. Specifically, the Company would be building two commercial-scale plants, referred to as "Origin 1" and "Origin 2." Origin 1 was expected to be operational by the end of 2022. Origin 2, a significantly larger manufacturing plant, was expected to be operational by mid-2025 and to supply the majority of the Company's products from 2025 until 2027. A third plant, "Origin 3," was expected to be launched in 2027.

75.     The Company forecasted costs of $1.07 billion associated with the construction of Origin 2. The Company represented that it did not anticipate generating any revenue until 2023. The Company further represented that it did not anticipate reaching commercial scale production or generating positive EBITDA until 2025, when Origin was expected to become operational. Accordingly, the completion of Origin 2 was central to the Company's growth prospects. Indeed,

during a conference call held on February 17, 2021 in connection with the foregoing announcements, Defendant Riley highlighted the significance of Origin 2 for the Company:

> After years of running our pilot plants, we are excited that our first large scale plant, Origin One, is under construction and anticipated to be operational by the end of 2022. Origin Two will be much larger than Origin One and our first commercial scale plant. It is expected to come online in 2025, and by 2028 we expect to have four plants supporting more than $2 billion of annual revenue. In 2026, which is expected to be our first full year of full commercial scale operations we forecast revenue of $830 million and EBITDA of $296 million.

76.    During the same call, Defendant Bissell touted the Company's strategic relationships with Nestle, Pepsi, and Danone, and explained that Origin would be focusing on PET production in the coming years:

> As previously highlighted, our current order book sits at approximately $1 billion which includes take-or-pay contracts, capacity reservations or other contractual arrangements. Customers have already paid us large sums in advance, merely to reserve capacity on plants yet to be built… We have strategic relationships with three of the world's largest buyers of plastic – Nestle, Danone and Pepsi, who are all investors in the company. These companies have rigorously tested our technology and produced bottles using our materials, ensuring that Origin can meet their high standards. Notably, all three have signed offtake agreements worth several hundred million dollars and have representatives on our Board. To further size the opportunity, meeting the annual needs of these three companies alone could require more than 20 commercial facilities, representing a massive revenue opportunity.

> * * *

> ***While the flexibility of our platform enables us to address an incredibly wide range of materials, the product that we will make from CMF initially is PET. PET is a very widely used material due to its beneficial properties, and importantly is the polymer with the largest and most established recycling infrastructure. Origin is the only company that can make PET that is chemically identical using a carbon negative process—not by buying offsets.***

### Timeline for the Construction of Origin 2

77.    On April 19, 2021, Origin filed an analyst day presentation with the SEC (the "2021 Analyst Presentation"). Therein, the Company provided the following timeline for Origin 2's project

development, front-end engineering design ("FEED"), and construction:



78.   The foregoing timeline was repeatedly disseminated by the Individual Defendants throughout the Relevant Period. As indicated, the Company had to undergo project development and FEED before beginning construction of Origin 2.

79.   In the context of chemical plant development, front-end loading ("FEL") is a project management framework that includes planning, design, and assessments of risk and feasibility to prepare for the engineering and construction of the plant. FEL involves three distinct phases.

80.   FEL 1 involves assessments of risk and feasibility, identifying necessary equipment and materials, forecasting expenses, and creating preliminary timelines for the project.

81.   FEL 2, or pre-FEED study, builds upon the foundation established in FEL 1 and involves defining the project scope with increased specificity, updating expense forecasts with greater accuracy, establishing an updated timeline, and making key decisions with respect to project design and direction.

82.   FEL 3, or the FEED study, is the most comprehensive and detailed phase and involves finalizing project design, establishing detailed engineering specifications, refining cost estimates, and updating key timelines to prepare for construction. The detailed data arising out of this phase

informs the project's final investment decision ("FID"), or the determination by the project's key stakeholders whether to proceed with the investment.

83.     In 2021, Origin was in the FEL 1 phase for Origin 2, and it enlisted the help of an engineering firm in November 2021. By this time, the Company had completed a preliminary project schedule and cost estimate, but it was still in the process of completing other key aspects of FEL 1.

84.     In addition to providing the schedule for Origin 2, the 2012 Analyst Presentation specified that Origin 2 would primarily focus on the production of PET and HTC fuel:

## Long-term target operating model

| Illustrative Run-Rate Economics | Origin Plant 1 | | Origin Plant 2 | | Origin Plant 3-7 Average | |
|---|---|---|---|---|---|---|
| Mn lb. biomass input | 49 | | 2,205 | | 2,205 | |
| Mn lb. products sold | 146 | | 2,412 | | 1,313 | |
| CapEx ($Mn) | $70[1] | | $1,072 | | $811 | |
| ROIC (Adj. plant margin/CapEx) | NM | | 35.9% | | 51.1% | |

| | $Mn | $/lb. product | $Mn | $/lb. product | $Mn | $/lb. product |
|---|---|---|---|---|---|---|
| Revenue | $122 | $0.84 | $708 | $0.29 | $637 | $0.49 |
| Consumer materials | $122 | | $414 | | $291 | |
| Industrial materials | | | $294 | | $346 | |
| Biomass feedstock | ($7) | ($0.05) | ($56) | ($0.02) | ($56) | ($0.04) |
| Other feedstock & variable costs | ($7) | ($0.05) | ($93) | ($0.04) | ($108) | ($0.08) |
| Tolling & downstream processing | ($106) | ($0.73) | ($154) | ($0.06) | ($39) | ($0.03) |
| Adj. Contribution[2] | $2 | $0.01 | $405 | $0.17 | $435 | $0.33 |
| Plant labor + other fixed costs | ($6) | ($0.04) | ($20) | ($0.01) | ($20) | ($0.02) |
| Adj. Plant Profit | ($4) | ($0.03) | $385 | $0.16 | $415 | $0.32 |
| Primary Products | PET/F, CMF, higher value application development samples | | PET, HTC fuel | | PET, PET/F, PEF, CMF, FDCA, carbon black, activated carbon, HTC fuel | |

85.     In numerous statements issued prior to the start of the Relevant Period, the Individual Defendants highlighted the benefits of focusing on PET production. For instance, On May 25, 2021, Defendant Bissell stated the following:

> The reason why we went after PET first is, we're really solving the front end, which is when you make materials, you emit carbon. We thought if we can bring our platform to PET, you can take PET and you can make it so that it's carbon negative, instead of emitting carbon when it's produced, but there's the end-of-life consideration as well for all materials, not just plastics.

* * *

The reason why we went for PET is because PET has by far the best end of life answer for, frankly, I would say commodity materials generally, not even just plastics, and PET is substantially recycled. It's a great sort of material from a property perspective, so it has a strong desire for use as well. Our material drops directly into the PET recycling stream, so it goes straight in, it's the same stuff. You make it, and it's low carbon or carbon negative on the front end, and then it gets recycled and continues to be recycled.

86.    Defendant Bissell later touted the market for PET, stating that "[e]ven just for PET, the market is so large that you're not even talking about dozens of plants. You're talking about scores, hundreds, in theory, of plants that are required, even at these very large scales in order to address these markets falling over time."

87.    In June 2021, *Chemical Week* published an article by Rebecca Coons, titled "Origin Materials bets on decarbonization," which quoted Defendant Bissell as affirming that Origin was focusing on PET production in the near-term due to low market risk and the fact that "[c]ustomers can use it in their existing supply chain [and] they don't have to redesign anything or retool anything. . . . That means that we don't have to worry about adoption cycles." The article continued, stating the following:

Entering the market with PET—a high-volume, low-margin product—runs counter to many strategies in the biobased chemicals. "The question there is really one of economics right?" Bissell says. "If you have a really low-cost platform, which we do, we get plenty of margin going after a large market like PET. And, let['s] be realistic: if your goal is to make an impact—because at the end of the day we are focused on making an impact, not just building an attractive business—picking a target that is 0.1% of the global materials market by volume…is not going make a massive difference."

88.    During the Relevant Period, the Individual Defendants continued to affirm its commitment to the production of PX and PET. For instance, on February 23, 2023, the Company represented that "due to strong customer demand," Origin was "substantially committed for our Origin 2 paraxylene and PET capacity." Likewise, on May 10, 2023, the Company referred to PET derived from PX as its "flagship" product for Origin 2, touting the Company's process for the production of a "next-generation PET." On June 8, 2023, the Individual Defendants reiterated that

PET derived from PX was Origin 2's "flagship" product, explaining that the Company's decision to focus on the production of PET derived from PX "was very intentional" as "it's one of the best polymers out there."

89.    Company management continually represented that they were closely monitoring Origin 2's construction timeline and projected costs. For instance, during an earnings call, hosted by the Company on August 12, 2021, Defendant Bissell stated the following:

> Now on to slide 8, I will turn to our progress on Origin 1 and Origin 2. We are of course continually reviewing construction costs and timeline to assess macroeconomic perturbations such as inflation and supply chain disruption, we were pleased to reaffirm our previously disclosed expected capital budget and production timelines for Origin 1 and Origin 2.

\* \* \*

> Similarly, Origin 2 remains on track for completion by mid 2025.

90.    Throughout the next year, the Individual Defendants consistently represented that the Company was on schedule with respect to Origin 2 that they expected the project to be complete by mid-2025.

91.    On November 12, 2021, the Company issued a press release, announcing Origin's third quarter 2021 financial results. Therein, Defendant Riley confirmed that "Origin 2 [will be] completed by mid-2025." The press release further stated that Origin was "reaffirming the previously disclosed Origin 2 capital budget and production timeline" and hiring Worley Limited to assist with preparation during the FEL 1 phase. During a related earnings call, hosted by the Company on the same day, Defendant Bissell stated that "Origin is reaffirming the previously disclosed capital budgets and production timelines for Origin 2…We continue to monitor construction costs and timelines to assess the impact of macroeconomic movements such as inflation and supply chain disruptions."

92.    In another press release, issued by the Company on February 24, 2022, Defendant Riley explained that "Origin 2 remains on track to be operational by mid-2025. We announced that

we have selected Geismar, Louisiana for Origin 2's location, subject to finalization of economic incentives, and are announcing today the selection of Hunt, Guillot & Associates as the project's owner's engineer." During the related earnings call, hosted by Origin on the same day, Defendant Bissell maintained that Origin 2 "remains on track to be mechanically complete and operational in mid-2025. Origin 2 will produce carbon negative materials used to make PET plastic." Defendant Bissell further explained that Origin 2's "[f]ront end design is well underway and Origin expected detailed venture to begin in 2023."

93.     In connection with the Company's fourth quarter 2021 earnings report, Origin published a presentation on its website, detailing Origin 2's expected capacity and explaining that "[t]he plant is expected to convert an estimated 1 million dry metric tons of sustainable wood residues each year into carbon-negative materials used to make PET and HTC for a wide variety of end markets."

94.     During an earnings call on May 9, 2022, Defendant Bissell stated that, "[w]ith regard to Origin 2, our previously disclosed capital budget and construction timeline are unchanged. To be clear, we do see the inflationary environment and continue to closely monitor costs, but we are proactively managing our cost base and have built in substantial contingencies into our initial projections." Also during the call, Defendant Bissell stated the following regarding Origin 2's engineering and planning phases:

> And then for Origin 2, we're in the front end engineering process right now. We're looking to have that process complete next year. At that point, once you have that, you can sort of bid out that the engineering package from the feed package from that process to get fixed pricing for it from EPCs. And then we can pull together the massive stack of contracts that we've put together. And then of course, feedstock supply agreements, all together into the project financing.

95.     On August 3, 2022, during the Company's second quarter 2022 earnings call, Defendant Bissell reiterated that, "[w]ith regard to Origin 2, our previously disclosed capital budget, construction timeline and financing are unchanged. As discussed on prior calls, we are closely monitoring costs associated with the current high levels of inflation and the challenging supply chain

environment. We continue to proactively manage our cost base and note that we have built appropriate contingencies into our initial projection."

96.     On November 3, 2022, during the Company's third quarter 2022 earnings call, Defendant Bissell similarly stated that "[f]or Origin 2, the previously disclosed capital budget construction timeline and financing assumptions are unchanged." Also during that call, Defendant Bissell explained that, while Origin 2 had progressed to the FEL 2 phase, the Company would need more time than initially budgeted "to expand on the value engineering work":

> The team is optimizing and refining the scope and layout of the plant, incorporating value engineering activities. We are producing updated equipment arrangements and flow diagrams through our FEL2 engineering contractor. While we had hoped to complete these tasks by the end of Q3, we decided that it was more important to expand on the value engineering work to get it done correctly upfront.

97.     The Company published presentations on its website in connection with each of its earnings reports from November 2021 until May 2023. Each of these presentations repeated that FEED for Origin 2 would be completed in early 2023 and that construction would start by mid-2023 and be completed by mid-2025.

***The Individual Defendants Were Aware that Chemical Fouling Issues Would Delay the Completion of Origin 2 and Cause the Company to Shift its Focus Away From PX***

98.     Throughout the Relevant Period, the Individual Defendants were aware that the Company was experiencing chemical fouling issues, preventing Origin from finalizing the chemistry for Origin 2 with respect to PX and delaying the construction of Origin 2.

99.     FE 1, a technical development engineer at Origin, explained that fouling issues were discussed during biweekly meetings with the Company's R&D group ("R&D Meetings"). FE 1 stated that the issues prevented the Company from finalizing the chemistry for Origin 2 and explained that his team was behind schedule in providing data to Origin 2's outside engineering firm, causing delays during the FEL 2 phase.

100.    FE 1 stated that, in December 2022, Defendants Riley and Bissell led a quarterly all-

hands Company meeting. During the meeting, Defendants Riley and Bissell revealed that the Company was considering scaling down the size of Origin 2, breaking down the construction of the plant into two distinct phases, and shifting the focus of Origin 2 away from PX due to the economics of PX. At the same meeting, FE 1 recalled being told that the Company was far from completing the FEL 2 phase for Origin 2.

101.    In early 2023, FE 1 was informed during an R&D Meeting that the Company was experiencing unexpected chemical issues needed for scaling commercial PX. Resolving these issues was causing delays, increasing costs, and causing the Company to consider shifting Origin 2's focus away from PX and splitting the construction of Origin 2 into two phases.

102.    FE 1 recalled attending weekly meetings, held by video conference every Friday morning. FE 1 explained that Defendant Bissell was a "huge contributor" to the meetings and "was in charge" of the weekly meetings. During one such meeting on March 3, 2023 (the "March 3, 2023 Meeting"), Defendant Bissell explained that the Company was breaking up the construction Origin 2 into two distinct phases and that Origin 2 would longer be producing PX. According to FE 1, Defendant Bissell explained that the Company "[was] going to move in this new direction" due to poor performance of PX and high costs of the plant. FE 1 further explained that Defendant Bissell presented a detailed plan to implement the changes. Considering Company management had already formulated such detailed plans, FE 1 concluded that Defendant Bissell must have known months before the March 3, 2023 Meeting that Origin 2 was shifting its focus away from the production of PX.

103.    FE 1 further recalled emails circulated by the end of March 2023, affirming the changes communicated by Defendant Bissell at the March 3, 2023 Meeting and discussing delays in the FEL 2 phase for Origin 2.

104.    The Individual Defendants' knowledge of the fouling issues and plans to shift focus away from the production of PX is further confirmed by the Company's partnership agreement with Avantium, a company that operated the world's first factory to produce FDCA on a commercial scale.

105.    Immediately prior to the start of the Relevant Period, on February 21, 2023, while the Individual Defendants were continuing to represent that Origin 2 would primarily be producing PX, Origin entered into a partnership agreement with Avantium to accelerate production of FDCA at Origin 2. During a February 22, 2023 conference call, Avantium's CEO stated the following regarding the partnership agreement:

> The license agreement provides Origin access to relevant parts of Avantium's process technology to enable the conversion of CMF into FDCA at a facility of 100 kiloton per annum scale. . . . ***Avantium will provide Origin Material for instance with a Process Design Package (PDP) and an operating manual. Avantium will also support Origin Materials during the FEED- (front-end engineering design) and EPC- (engineering, procurement and construction) phases, as well as the commissioning and start-up of the licensed facility.*** With this, Origin can design, construct and operate a 100 kiloton licensed facility and produce, use, sell FDCA that is manufactured at that facility.

106.    Avantium's CEO explained that it would take Origin several years to implement FDCA into its Origin 2 plant design:

> That facility is going to be built in Geismar in Louisiana, and we have to be careful with what we are saying on behalf of Origin, ***so it's up to Origin to make announcement regarding the timing of OM2 and of the licensed facility. That is not something that we comment on. Of course, we have our own experience with this how long these things take, so this is not something that is going to happen over the next few years, but this is probably going to take a bit longer, but that is up to them to make further announcements on.***

107.    Further confirming the Individual Defendants' knowledge of the delays caused by the chemical fouling issues was an amendment to the Company's offtake agreement with Pepsi, finalized on May 9, 2023 (the "May 9, 2023 Amendment"). Origin and Pepsi entered into the initial offtake agreement in 2018. That agreement provided Pepsi with a 5-year term to purchase a specified quantity of product per year from the Origin 1 plant, and an additional 5-year term to purchase a specified quantity of product per year from the Origin 2 plant.

108.    Pepsi had the right to terminate the initial offtake agreement with Origin 2's commercial operation did not commence by June 30, 2025, or if PX was not delivered from Origin

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2 to Pepsi by September 30, 2025. Pursuant to the initial offtake agreement, in the event that Origin was substantially likely to experience delays in Origin 2's construction, the Company was required to notify Pepsi and to provide a new expected timeline. In such an instance, Pepsi had the right to terminate the agreement.

109.    The May 9, 2023 Amendment altered Pepsi's right to terminate the agreement, allowing termination if commercial operation at Origin 2 did not commence by June 30, *2026* or if product was not delivered from Origin 2 to Pepsi by December 31, *2026*. The May 9, 2023 Amendment further allowed Origin to provide Pepsi with FDCA from Origin 2, rather than just PX. The May 9, 2023 Amendment also included the following provision, clearly indicating that the Individual Defendants had been planning to shift its focus toward production of FDCA:

> WHEREAS, Supplier is focused on carrying out its strategic plan to accelerate the production of FDCA and PEF for advanced chemicals and plastics and accordingly is contemplating producing, or having produced, FDCA from intermediates produced at New Plant [(Origin 2)] and/or its subsequent plant, Origin 3.

110.    The May 9, 2023 Amendment further provided that Origin was no longer required to produce PX at the plant and that, upon completing FID, Origin would provide Pepsi with an updated allocation of PX *and* FDCA that Origin could produce on an annual and aggregate basis.

111.    The Company's quarterly report, filed on Form 10-Q with the SEC for its first quarter of 2023 (the "1Q23 10-Q"), described the May 9, 2023 Amendment as follows:

> On May 9, 2023, the Company amended its Offtake Agreement with a customer. The amendment added FDCA as a product potentially available to be supplied to the customer under the Offtake Agreement and eliminated the customer's obligation to buy and the Company's obligation to sell a specified annual amount of product from the Origin 1 facility while adding the planned Origin 3 facility as a potential source of product to be supplied to the customer. The amendment also made the customer's obligation to buy and the Company's obligation to sell a specified annual amount of product from the Origin 2 facility non-binding unless and until the Company accepts a purchase order from the customer. In addition, the amendment eliminated certain construction and delivery milestones associated with the Origin 1 facility, along with the penalties applicable in the event those milestones were not met, ***and updated the construction and delivery milestones associated with the Origin 2 facility.***

* * *

On May 9, 2023, the Company amended its offtake agreement with a customer to, among other things, eliminate certain construction and delivery milestones associated with the Origin 1 facility, along with the penalties applicable in the event those milestones were not met, including the right to terminate noted above. *The amendment also updated the construction and delivery milestones associated with the Origin 2 facility such that the agreement now is terminable if commercial operation of Origin 2 has not occurred before June 30, 2026 or if delivery of product from Origin 2 has not occurred before December 31, 2026.*

112.    Accordingly, the Individual Defendants were clearly aware by at least May 9, 2023, that Origin 2's schedule was delayed and that the Company would have to shift its focus away from PX for Origin 2. Despite this, the Individual Defendants continued to represent publicly that the Company was committed to focusing on PX production at Origin 2 and that construction of Origin 2 was progressing on schedule and would be operational by mid-2025.

113.    Indeed, it was not until August 9, 2023 that the Individual Defendants would finally reveal that Origin 2 would no longer produce PET derived from PX and would instead focus on producing PEF derived from FDCA. That day, the Individual Defendants would further disclose that Origin 2's construction would be significantly delayed. Specifically, construction of Origin 2 would be broken up into two phases, with phase 1 expected to be operational by late-2026 or 2027 and phase 2 expected to be operational by 2028.

***Materially False and Misleading Statements***

114.    On February 23, 2023, Origin filed a current report on Form 8-K with the SEC, which included a press release announcing the Company's fourth quarter and full year 2022 financial results (the "FY22 Release"). The FY22 Release reported on the Company's purported progress with respect to the development of Origin 2:

*The Company continues to make progress on front-end design, construction planning, and financing for Origin 2. The Company has also made progress developing new products and applications which may be incorporated into the design of the plant, such as FDCA, PEF, as well as biofuels from an "oils and extractives" stream co-produced alongside CMF and HTC*, which has not been included in previous plans. The Company expects to provide an update on new product offerings and construction plans for the Origin 2 plant in mid-2023.

115.    The FY23 Release quoted Defendant Riley as stating that, "for Origin 2, front-end loading, construction planning, and financing are progressing with an update to be provided mid-2023."

116.    During a related earnings call, hosted by the Company on the same day, Defendant Riley affirmed the Company's commitment to PET production at Origin 2 and explained the reasoning why the Company was considering additional products for Origin 2:

> **As previously disclosed, due to strong customer demand, we are substantially committed for our Origin 2 paraxylene and PET capacity.** As such, beginning in the fourth quarter, our sales and marketing team has shifted its focus from active marketing of PET towards higher-margin products such as carbon black and advanced CMF-derived products including FDCA and PEF for Origin 2 and beyond.
>
> * * *
>
> We continue to make progress on frontend design, construction planning, and financing. **We have also made progress developing new products and applications which may be incorporated into the design of the plant, such as FDCA, PEF as well as biofuels** from an oils and extractives stream co-produced alongside CMF and HTC and which has not been included in previous plans. We expect to provide an update on new product offerings and construction plans for the Origin 2 plant in mid-2023.

117.    In connection with the earnings call, the Company published a presentation on its website, which included the following timeline for Origin 2:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /





118.    With respect to the timeline identified above, Defendant Bissell stated the following during the earnings call:

While Origin 1 is a substantial commercial plant, Origin 2 is expected to be much larger, with far greater economies of scale.

* * *

***Turning to Origin 2 on Slide 11, we continue to make progress on the front-end design, construction planning, and financing of our second plant, to be built in Geismar, Louisiana.*** The overall site plot plan and logistics plan have been developed. ***Notably, we have made progress on developing new products and applications which may be incorporated into the design of that plant***, such as FDCA, PEF as well as biofuels from an oils and extractives stream co-produced alongside CMF and HTC and which has not been included in previous plans. We expect to provide an update on new product offerings and construction plans for the plant in mid-2023.

* * *

I'd also like to provide you with some additional detail about what we're currently working on for Origin 2 in the area of product development. ***We have made progress developing new products and applications which may be incorporated into the design of Origin 2 such as FDCA, PEF, and biofuels***. I highlight this because the markets for some of these new, functionally-advantaged products are showing up sooner than we initially anticipated. While we originally expected our Origin 1 product development activities to result in new, performance-advantaged products that we would make at Origin 3, we now believe that some of those products could be pulled forward meaningfully and produced at Origin 2 as well. ***We are pleased to potentially add some of these products into the demand slate of Origin 2.***

* * *

***To summarize, I'm proud of how our team continues to execute against our Origin 1 and Origin 2 construction milestones.***

119.    Also on February 23, 2023, the Company filed its 2022 annual report on Form 10-K with the SEC (the "2022 10-K"), which was signed by Defendants Bissell, Riley, Richardson, Dorer, Drucker, Fish, Harvey, and Cook. The 2022 10-K reiterated that "[w]e continue to make progress on front-end design, construction planning, and financing."

120.    The 2022 10-K purported to warn of risks associated with construction delays for Origin 2. Specifically, the 2022 10-K stated the following:

***Construction of our plants may not be completed in the expected timeframe or in a cost-effective manner. Any delays in the construction of our plants could severely impact our business, financial condition, results of operations and prospects***.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

\* \* \*

The construction and commission of any new project is dependent on a number of contingencies some of which are beyond our control. ***There is a risk that significant unanticipated costs or delays could arise due to***, among other things, errors or omissions, unanticipated or concealed project site conditions, including subsurface conditions and changes to such conditions, ***unforeseen technical issues*** or increases in plant and equipment costs, insufficiency of water supply and other utility infrastructure, or inadequate contractual arrangements. Should these or other significant unanticipated costs arise, this could have a material adverse impact on our business, financial performance and operations. No assurance can be given that construction will be completed on time or at all, or as to whether we will have sufficient funds available to complete construction.

121.    The risk disclosure was materially misleading because the 2022 10-K represented a risk that had already materialized as merely hypothetical. Specifically, the Individual Defendants knew when the risk disclosure was issued that construction of Origin 2 would "not be completed in the expected timeframe" and that "delays in the construction of [Origin 2]" would "severely impact [Origin's] business, financial condition, results of operations, and prospects."

122.    Market analysts and commentators understood the representations identified above as confirming that Origin 2 was expected to be operational by mid-2025, according to its initial schedule. For instance, on February 24, 2023, Craig Stines, an analyst for Craig-Hallum Capital Group LLC ("Craig-Hallum") stated that "[t]he company expects to provide an update in mid-2023 on Origin 2 (2.4B pounds) in Geismar, LA, ***where front-end design, construction planning, and financing are progressing toward current planned start-up in mid-2025 with expected CapEx of $1.1B***."

123.    On March 7, 2023, the Company published a presentation on its website, which provided the following update regarding Origin 2:

/ / /

/ / /

/ / /

/ / /

## Construction – Origin 2 (1 of 3)

"Origin Materials Announces Geismar, Louisiana as Location for Second Manufacturing Plant, Origin 2" – February 16, 2022

- The company has selected a site in Geismar, Louisiana, for the construction of its first world-scale manufacturing facility, Origin 2, subject to finalization of economic incentives from the State of Louisiana
- The plant is expected to convert an estimated 1 million dry metric tons of sustainable wood residues each year into carbon-negative materials used to make PET and HTC for a wide variety of end markets
- The site offers access to plentiful sustainable wood residues, including "residuals" or waste wood from local large-scale pulp mills. The Geismar wood basin is estimated to consist of approximately 650 million green short tons[1] of inventory[2]
- Pending state and local incentives are estimated to be worth more than $100 million, and the State of Louisiana has preliminarily awarded Origin a Private Activity Bond volume cap allocation in the amount of $400 million
- Construction expected to start by mid-2023 and the plant is expected to be operational mid-2025

*(Continued on next page)*



The Geismar wood basin, shown in green, offers plentiful sustainable wood residues, including "residuals" or waste wood from local large-scale pulp mills[1]

1. 2,000 pounds, inclusive of moisture content.
2. Fisher International.
As previously reported in the Q4 2021 Earnings Presentation of Origin Materials, Inc. dated February 24, 2022.

 37

## Construction schedule – Origin 1, Origin 2, and Origin 3

Company expects to provide an update on new product offerings and construction plans for the Origin 2 plant in mid-2023



1. Front-end engineering design.
As previously reported in the Q4 2022 Earnings Presentation of Origin Materials, Inc. dated February 23, 2023.

124.   On May 10, 2023, the Company filed a current report on Form 8-K with the SEC, which included a press release announcing the Company's first quarter 2023 financial results (the

"1Q23 Release"). The 1Q23 Release quoted Defendant Riley as stating that, "[f]or Origin 2, front-end design, construction planning, and financing are progressing, and we expect to provide an update during our Q2 earnings call in August." The 1Q23 Release further stated the following:

> For Origin 2, the Company continues to make progress on front-end design, construction planning, and financing. The Company has also made progress developing new products and applications that may be incorporated into the design of the plant, including FDCA, PEF, and biofuels. The Company expects to provide an update on new product offerings and construction plans for the Origin 2 plant in August 2023.

125.    During a related earnings call, hosted by the Company on the same day (the "1Q23 Earnings Call"), Defendant Riley continued to tout the Company's purported progress with respect to the front-end design and construction planning of Origin 2:

> Third, we continue to make progress on the front-end design, construction planning, and financing of Origin 2. We continue to expect that Origin 2 can be fully funded from a combination of existing cash on hand, previously indicated traditional project financing, and potential strategic partnerships. We plan to provide an update on new product offerings and construction plans for the Origin 2 plant in August 2023 during our Q2 earnings call.

126.    Also during the 1Q23 Earnings Call, Defendant Bissell represented that the Company was "executing against [its] Origin 1 and Origin 2 milestones":

> Regarding Origin 2, our second plant to be built in Geismar, Louisiana, we continue to advance for design, construction, planning, and financing. We continue to make progress developing new products and applications, which may be incorporated into the design of the plant such as FDCA, which can be converted to [P]EF and carbon black biofuels. We expect to provide an update on new product offerings and construction plans for the plant in August 2023.

* * *

> ***To summarize, I'm proud of how our team continues to execute against our Origin 1 and Origin 2 milestones.***

127.    Also on May 10, 2023, the Company filed its 1Q23 10-Q with the SEC. Therein, the Company stated that "[w]e continue to make progress on front-end design, construction planning,

and financing."

128.    Market analysts and commentators understood these statements as reaffirming the expected timeline for Origin 2. For instance, on May 11, Craig-Hallum published an article by Eric Stine and Aaron Spychalla, titled "Commercial Momentum As Strong As Every With Origin 1 Start-Up Imminent & Origin 2 On Track. Maintaining Buy Rating." The article stated that "[l]ooking beyond the near-term, ORGN also continues to take needed front-end design and engineering steps and along with the financing needed for planned Origin 2 completion in 2025."

129.    The 1Q23 10-Q additionally repeated and expanded upon the misleading risk disclosure that was included in the 2022 10-K:

**Construction of our plants may not be completed in the expected timeframe or in a cost-effective manner. Any delays in the construction of our plants could severely impact our business, financial condition, results of operations and prospects.**

\* \* \*

The construction and commission of any new project is dependent on a number of contingencies some of which are beyond our control. **There is a risk that significant unanticipated costs or delays could arise due to, among other things**, errors or omissions, unanticipated or concealed project site conditions, including subsurface conditions and changes to such conditions, **unforeseen technical issues or increases in plant and equipment costs**, insufficiency of water supply and other utility infrastructure, or inadequate contractual arrangements. Should these or other significant unanticipated costs arise, this could have a material adverse impact on our business, financial performance and operations. No assurance can be given that construction will be completed on time or at all, or as to whether we will have sufficient funds available to complete construction.

\* \* \*

**We have not produced our products in large commercial quantities**.

We have no experience in producing large quantities of our products. While we have succeeded in producing small amounts of our products in our pilot plant for customer trials and testing purposes, we have not yet commenced large-scale production. There are significant technological and logistical challenges associated with producing, marketing, selling and distributing products in the specialty chemicals industry, including our products, **and we may not be able to resolve all of the difficulties that may arise in a timely or cost-effective manner, or at all. While we believe that we understand the engineering and process characteristics necessary to successfully**

*build and operate our additional planned facilities and to scale up to larger facilities, we may not be able to cost-effectively manage production at a scale or quality consistent with customer demand in a timely or economical manner.*

\* \* \*

*Maintenance, expansion and refurbishment of our facilities, the construction of new facilities and the development and implementation of new manufacturing processes involve significant risks.*

The construction of new manufacturing facilities entails a number of risks and assumptions, including the ability to begin production within the cost and timeframe estimated and to attract a sufficient number of skilled workers to meet the needs of the new facility. Additionally, our assessment of the projected benefits associated with the construction of new manufacturing facilities is subject to a number of estimates and assumptions, which in turn are subject to significant economic, competitive and other uncertainties that are beyond our control. *If we experience delays or increased costs*, our estimates and assumptions are incorrect, or other unforeseen events occur, *our business, ability to supply customers, financial condition, results of operations and cash flows could be adversely impacted.*

*Finally, we may not be successful or efficient in developing or implementing new production processes. Innovation in production processes involves significant expense and carries inherent risks. Such risks may include difficulties in designing, developing, implementing, and scaling up new process technologies, development and production timing delays*, lower than anticipated manufacturing yields, product defects, and inability to consistently meet customers' product specifications, performance and carbon intensity, or cost requirements, among others. Errors, defects in materials, operating permit and license delays, customer product returns, interruption in our supply of materials or resources, and disruptions at our facilities due to accidents, maintenance issues, or unsafe working conditions, all could affect the timing, efficiency, or success of our production processes. *Such production issues can lead to increased costs and may affect our ability to meet product demand, which could adversely impact our business and results from operations*.

130.    This risk disclosure was materially misleading for the same reasons that the risk disclosure contained in the 2022 10-K was misleading. Further, the Individual Defendants were aware at the time that this risk disclosure was issued that Origin would "experience delays" in the construction of Origin 2 and that the Company was experiencing challenges producing PX at commercial scale.

131.    Also on May 10, 2023, Defendants Bissell and Riley participated in a fireside chat at

the UBS Sustainable Packaging Materials ESG Virtual Conference on behalf of the Company. During the conference, Defendant Riley maintained that "our flagship material is PET plastic, which is chemically identical to fossil-based PET plastic." Later during the conference, Defendant Bissell highlighted the benefits of the Company's focus on PET production:

> So the PET -- when we're making PET, right? Obviously, we can talk about all kinds of different products, but we'll keep it to PET in polyester. When we're making PET, it's identical to PET that's made for fossil materials. So that's brilliant. Recycles the same way. It's the same quality as Origin Material, et cetera. So it's sort of a great add. We kind of think of it as the system you want ideally is you have carbon-negative PET going into the system, which is then subsequently recycled indefinitely, right? That's sort of the ideal version. And then actually, when we make some -- we make like a next-generation PET that has better performance in a whole bunch of areas. For that PET that's actually recyclable as well.

132.     On May 12, 2023, the Company published a presentation on its website, which provided the following update regarding Origin 2:



**Construction – Origin 2 (1 of 3)**

"Origin Materials Announces Geismar, Louisiana as Location for Second Manufacturing Plant, Origin 2" – February 16, 2022

- The company has selected a site in Geismar, Louisiana, for the construction of its first world-scale manufacturing facility, Origin 2, subject to finalization of economic incentives from the State of Louisiana
- The plant is expected to convert an estimated 1 million dry metric tons of sustainable wood residues each year into carbon-negative materials used to make PET and HTC for a wide variety of end markets
- The site offers access to plentiful sustainable wood residues, including "residuals" or waste wood from local large-scale pulp mills. The Geismar wood basin is estimated to consist of approximately 650 million green short tons[1] of inventory[2]
- Pending state and local incentives are estimated to be worth more than $100 million, and the State of Louisiana has preliminarily awarded Origin a Private Activity Bond volume cap allocation in the amount of $400 million
- Construction expected to start by mid-2023 and the plant is expected to be operational mid-2025

The Geismar wood basin, shown in green, offers plentiful sustainable wood residues, including "residuals" or waste wood from local large-scale pulp mills[1]

*(Continued on next page)*

1. 2,000 pounds, inclusive of moisture content.
2. Fisher International.
As previously reported in the Q4 2021 Earnings Presentation of Origin Materials, Inc. dated February 24, 2022.



133.     On May 22, 2023, Defendant Riley affirmed the timeline for Origin 2 during a fireside chat at the Morgan Stanley 8th Annual Sustainable Futures Conference, stating that "our

much larger and first world-scale plant Origin 2, is scheduled to come online in the 2025 time frame in Geismar, Louisiana." Later during the conference, Defendant Riley highlighted the benefits of one of the Company's strategic partnerships, specifically with respect to the Company's PET production:

> Another partnership just highlight that we announced under recently Indorama. Indorama is the world's largest maker of PET plastic, but not everybody has heard of them in the U.S. markets, but a very natural partnership for us. If you think about what leaves our plants is the paraxylene component of PET and then partnering with someone like Indorama to convert that further into PET, makes a lot of sense. They have a lot of the customer relationships and stuff like that. And so I think you'll see us continuing to do strategic partnering like that, where we stay as far upstream as we can and then partner with sort of best-in-class partners to deliver to the end markets.

134.    Similarly, Defendant Bissell touted the Company's process for PET production, emphasizing that Origin's process distinguished it from competitors:

> More specifically, I think there are a bunch of sort of tactical issues around it, like if you're looking at mechanically recycled PET, which is the majority of recycled PET by far, the quality is just not quite the same as new material that we can make.
>
> And so that makes a difference for a lot of customers for them to be able to get the quality of product that they want. They need to be able to use new stuff. They can't use mechanically recycled materials. We tend to have a lower carbon footprint. In fact, not tend to. I don't know of any recycled PET that has a lower carbon footprint than the stuff that we can make. So there's a trade-off in terms of the carbon impact and circularity. Again, I think that's not so much a concern because all of it is going to get consumed, but what we can make and the recycle material, but it does make for a trade-off for customers. Geographic flexibility and scale can make a difference.

135.    On June 8, 2023, Defendants Bissell and Riley participated in a fireside chat on behalf of the Company at the Cowen's Sustainability Week Conference. At the conference, Defendant Riley maintained that PX was the Company's flagship product and stated the following:

> So Origin, we've spent over 10 years developing a highly proprietary technology platform that really has created a new fundamental chemical building block called CMF, chloro-methyl-furfural. And we set up from day one to be cost competitive with oil while using cellulose as our feedstock. So think the waste coming off a sawmill, agricultural waste as a feedstock we take in.

Highly efficient process that basically retains every carbon atom as a soluble product and produces three core intermediates, CMF, which I mentioned, *which can go on to our flagship product, para-xylene, which go into PET plastic* for example, which is a $100-billion market opportunity; solid called hydrothermal carbon, which can be used to make carbon black, which can go into tires and other things like that, and in the biofuel stream.

And so *highly efficient platform technology*. Pepsi, Nestlé, and Danone were early investors in the company, joined our Board and helped prove our materials all the way through to food-grade PET plastic, which was a significant milestone in our development.

136.    Also during the conference, Defendant Bissell highlighted the benefits of the Company's decision to focus on PET production:

I think the way to think about PET first is PET fits the end-of-life criteria and frankly, a lot of the application criteria, really, really well. So it is a very usable plastic. It doesn't have a lot of additives in it which costs sort of human health concerns and the same that you might see with polycarbonates or PVC or [methane] or something like that. And so it is sort of the plastic you want to go to that actually makes that data. You want to use this kind of plastic relative to other kinds of materials out there. It has great properties in terms of transparency. It's strong. It can work as a fiber. It's just a great material.

From an end-of-life perspective, it already has the largest recycling stream of any plastic, of any organic material -- or actually, synthetic organic material. And so it's really in a great spot from an end-of-life perspective, but we need to get better. Our view was if we're going to bring our platform, which is a pretty broad-based, carbon-negative platform, to a particular polymer, particular material; first, we wanted to take something that was already the best out there and we make it better. We weren't going to try to sort of drag up one of the less performance materials and try to make it average.

*And so for us, going into PET was very intentional*. Again, it's one of the best polymers out there from a performance perspective. It's clearly the best from an end-of-life perspective, then what we do is we make it carbon negative.

And that's important because even if we got -- as a species, we got spectacular at capturing and recycling all of our PET and all of our materials, a lot of our materials are going into durable applications. Stuff that isn't getting used once and thrown away. And so, we are throwing away as much material as we consume to make stuff. And so consequently, you're always going to have to make a lot of material.

Things like a t-shirt or apparel are often made of polyester, that's sort of the dominant material to expand supply of textiles. And ideally, you're not throwing those things

away after one use. Something's gone horribly wrong if you throw it away after one year. And so we need ways to make these materials. Our view is take the best material that we can make, make it in a carbon-negative way, and then reuse it indefinitely.

137.    During the same conference, the following exchange occurred between an analyst from TD Cowen and Defendant Riley, once again confirming that the Individual Defendants considered PET the Company's "flagship" product:

> **Thomas Boyes – TD Cowen – Analyst**
> Great. And you touched upon this at the beginning of the call here. What are the different opportunities for CMF and HTC? ***In the near term, it sounds like it's PET***, fuel pellets, activated carbon; and longer-term, PEF, carbon black, and agriculture. Like how do you think about those different opportunities as far as which one is the kind of the largest component of that and how do you think that develops over time?
>
> **Defendant Riley**
> Yes, so CMF and HTC are both really important intermediates for us. So it's -- I make the analogy sometimes to gasoline and diesel -- Yeah. Big fractional components coming out of a refinery. If you want to be selling both to the high side, but you can't. So we sort of don't have a favorite child.
>
> ***CMF, as you said, para-xylene, which hopefully goes into PET, is kind of our flagship and our first product***. It's effectively an unlimited market for our purposes. The great spot to be for all the reasons that I mentioned earlier.

138.    Also on June 8, 2023, Origin filed a proxy statement on Form DEF 14A with the SEC (the "2023 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Fish, Drucker, Riley, and Tripeny to serve for another three-year term on the Company's Board and the compensation of certain of the Company's executive officers, including Defendants Bissell and Riley.

139.    With respect to the Company's risk oversight function, the 2023 Proxy stated the following:

> One of the key functions of the board of directors is informed oversight of our risk management process. The board of directors does not anticipate having a standing risk management committee, but rather anticipates administering this oversight function directly through our board of directors as a whole, as well as through various standing committees of the board of directors that address risks inherent in their respective areas of oversight. In particular, the board of directors is responsible for monitoring and assessing strategic risk exposure and our Audit Committee has the responsibility to

consider and discuss any major financial risk exposures and the steps our management will take to monitor and control such exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The Audit Committee monitors compliance with legal and regulatory requirements. The Compensation Committee assesses and monitors whether our compensation plans, policies and programs comply with applicable legal and regulatory requirements.

140. With respect to the Company's systems of internal control, the 2023 Proxy stated that "[t]he primary purpose of the Audit Committee is to discharge the responsibilities of the board of directors with respect to our corporate accounting and financial reporting processes [and our] systems of internal control and financial statement audits."

141. The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company was experiencing chemical fouling issues "at every step" of the process of converting CMF to PX at commercial scale; (ii) the fouling issues were causing substantial delays during the FEL 2 phase of the Origin 2 project; (iii) the Individual Defendants had been planning internally to scale down production of PX at Origin 2 or to shift focus toward another product; (iv) the Individual Defendants had been planning internally to split construction of Origin 2 into two phases; (v) the Company entered into a deal with Avantium to produce FDCA at Origin 2 to compensate for the Company's difficulties associated with producing PX at scale; (vi) contrary to the timeline repeatedly disseminated by the Individual Defendants, Avantium advised that it would take several years before Origin 2 could become operational with respect to production of FDCA; (vii) despite descriptions of the Board's and its committees' oversight responsibilities with respect to risk oversight and internal controls, the Board and its committees were not adequately fulfilling these responsibilities and were causing or permitting the Company to issue false and misleading statements; and (viii) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

***The Truth Emerges***

142. On August 9, 2023, the Company reported its second quarter 2023 financial results

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and revealed for the first time that construction for Origin 2 would be significantly delayed and would be split into two phases. The Company further disclosed that it would be shifting focus away from its flagship product, PX. Specifically, the Company issued a press release which stated the following:

> ***We are updating the product slate at our second commercial plant, Origin 2, to focus on the production of FDCA***, for which we have seen much greater demand than anticipated, as we indicated in February. While we initially expected Origin 2 to primarily focus on para-xylene ('pX') production for bio-PET, we have made significant progress in FDCA product development and commercialization and we now plan to bring FDCA forward to Origin 2, rather than at our third planned commercial plant, Origin 3, as initially reported in 2021. FDCA is a highly strategic focus for our platform, as its applications tend to offer performance advantages, higher margins, and thus higher value uplift for our platform intermediate, CMF.

* * *

> ***We are revising the plant's outlook and introducing a phased approach to construction. We expect that adapting in this manner to the high-cost environment will reduce project risk as we move forward on the path to profitability, with Phase 1 start-up projected for late 2026 to 2027 and Phase 2 start-up projected for 2028.***

143.    The press release further revealed that FID for Origin 2 would not be completed until 2025 and accordingly, construction of Origin 2 would not *start* until late-2025 at the earliest:

> The capital budget for Phase 1 of Origin 2 is expected to be up to $400 million while the capital budget for Phase 2 is projected to be up to $1.2 billion. This compares to the original $1.07 billion aggregate capital budget estimate originally provided in February 2021.

* * *

> The Company expects capital expenditure of up to $50 million for 2024, with the majority of Origin 2 capital spend to occur following the project's final investment decision ("FID") in 2025.

144.    On August 9, 2023, the Company hosted an earnings call (the "2Q23 Earnings Call"). During the call, Defendant Bissell further revealed that FDCA would be Origin 2's primary product, rather than just one of the chemicals on its product slate as previously  disclosed. Specifically, Defendant Bissell stated that "Origin 2 will focus primarily on FDCA production . . . our current

plan is a rational prioritization of Origin's researches towards more profitable, typically performance-enhanced chemical applications [at] Origin 2." Defendant Bissell further stated the following regarding the updated timeline for Origin 2:

> We now expect Origin 2 to be completed in 2 phases with Phase 1 estimated to be completed in late 2026 to 2027 and Phase 2 estimated to be completed in 2028 compared with our initial expectation for a mid-2025 completion. During Phase 1, the company expects to achieve profitability from its oils and extractives stream. From this stream, Origin plans to produce a drop-in biofuel with potential applications, including marine fuel and heat and power generation.

* * *

> Phase 2 2 will expand production to include the mass production of platform chemicals, CMF and HTC.

145.    Also during the 2Q23 Earnings Call, the following exchange occurred between an analyst from Bank of America and Defendant Bissell:

> **Steve Byrne – Bank of America – Analyst**
> I want to -- a couple of questions here on Origin 2. Is any of the delay in the cost increase because of shifting the focus away from paraxylene over to FDCA? I kind of suspect not, but I wondered if that was part of it. And maybe more importantly, when you first rolled out your financials for Origin 2, you were targeting 1 million tons of biomass feedstock into that plant. Is that still the design? But more importantly, you were targeting $0.16 a pound of margin from this PET pathway. As you move towards more of an FDCA pathway, what would you suggest is a more reasonable margin that, that plant you think is going to be able to produce?

> **Defendant Bissell**
> So first, you asked is FDCA and shifting towards that kind of product base part of the capital increase and schedule shift. And the answer actually is, in part, yes. It's not the only thing, but it's meaningful. So looking at these other products, one, takes more time, right? So we obviously didn't expect to be producing those kinds of products off of OM2 when we originally provided our estimates on schedule and cost. And so there are changes that get made. I'd say, generally speaking, if you're looking at FDCA, that has more of a schedule impact than it does an overall cost impact. And then for things like carbon black and other higher-value HTC products, that has both a schedule and a cost impact. So those are a part of it, although, again, they're not the only things. They're not solely responsible for that.

* * *

43

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

And so consequently, in a higher cost environment where we're going in general, right, which includes some of the things that we enumerated but things like higher material prices, obviously higher labor costs, energy, all sorts of things like that, as a consequence of those, we need to adjust by scoping down the scale of the plant. And so we expect that we're going to have a smaller-scale plant than the 1 million tons of biomass fed originally. And we provide a summary of that on one of the appendix slides in our earnings presentation. But generally speaking, we're expecting, by the time we're done with this plant, to be at about 500 KTA of feedstock rather than 1 million.

146.     During the same earnings call, the following exchange occurred between an analyst from Craig-Hallum and Defendant Bissell:

**Eric Stine – Craig-Hallum – Analyst**
Got it. And then just as we think about the change in the timeline, I can appreciate obviously higher interest rates. But that's a new dynamic since this all got started and you first gave that number for Origin 2 back in 2021, but it's not, again, new here over the last number of quarters. So I'm just trying to kind of think about how much of this can be ascribed to that, a higher rate environment versus, as you said, it's FDCA, you just need -- more time needed on the development side.

**Defendant Bissell**
Yes. So really, I think -- the first thing that's worth thinking about is -- and keeping in mind is, how long it takes to turn a new engineering assessment? And so as we have made adjustments and thought about sort of how to put both the opportunities that have been presented and the challenges that have arisen into a sort of bucket, and then figure out how – what's the best way to navigate through those sorts of things. Generally speaking, it could be very difficult to understand what the impact of those is going to be on something like a final cost or a revenue number or even a schedule, frankly, until you turn that through tens of thousands of hours of engineering time to convert that into a new scenario, right?

And in our case, we were actually running multiple scenarios. You put them in, you put them into the black box, and you get them out after a period of time. And so our view was, generally speaking, we need to process all of this information. And it wasn't really until all that recently that it made sense to take a different scenario approach to this. I think it's also worth mentioning that it's not just rates, right? So rates are one part of it, and they are a meaningful part. But there are other things as well that have an impact. Again, I mentioned sort of labor rates, materials costs, even energy volatility and volatility around some of these things can have a pretty significant impact on the way that you have to structure the risk management around plants like this.

147.     In connection with the earnings call, the Company published a presentation on its

website, which revealed that Origin had developed its strategy to shift production toward high-margin products, such as FDCA, *in February 2023*: "[a]s of February 2023, Origin Materials' commercial strategy evolved from demand generation to revenue generation and the development of higher margin products, and as such the Company does not plan to provide quarterly updates to its total signed offtake agreements and capacity agreements but will provide updates as appropriate." The presentation further stated that FDCA, Origin 2's new primary product, would not be produced at the plant until 2028.

148.    On this news, the price of Origin stock declined 66.5% in one day, from a close of $4.33 per share on August 9, 2023 to a close of $1.45 per share on August 10, 2023.

149.    As the market continued to digest the news, the price of Origin stock declined further, closing at just $0.99 per share on October 31, 2023, an additional 68% decline from the stock's August 10, 2023 closing price.

150.    Further, on November 30, 2023, Origin announced that it was slashing its workforce by 30% pursuant to an "organizational realignment" to focus on short-term, high-margin priority initiatives.

151.    On January 5, 2024, the Company filed a current report on Form 8-K with the SEC, revealing that Origin had received a letter from NASDAQ notifying the Company that it failed to meet the listing requirements, as Origin's stock had closed below $1.00 per share for 30 consecutive business days.

## DAMAGE TO THE COMPANY

152.    As a direct and proximate result of the misconduct detailed above, the Company has incurred and will continue to incur significant financial losses, including but not limited to, the costs of defending against and incurring potential class-wide liability in the Securities Class Action.

153.    These damages also include the costs of remediating deficiencies in the Company's procedures and controls, compensation and benefits paid to current and former members of the Board and Company executives, who breached their fiduciary duties to Origin, and reputational harm and loss of goodwill.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

154.    Furthermore, as a direct and proximate result of the misconduct detailed herein, Origin has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and management's breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

155.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

156.    Origin is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

157.    Plaintiff is a current shareholder of Origin and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

158.    A pre-suit demand on the Board of Origin is futile and, therefore, excused. At the time this action was commenced, the eight-member Board was comprised of Defendants Bissell, Cook, Fish, Harvey, Rogerson, Stephanou, and Tripeny (the "Director Defendants"), along with John Hickox, who joined the Board in March 2024 and is not a party to this action. Accordingly, Plaintiff is only required to show that four Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, at least seven of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

159.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

160.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

161.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

162.     Defendant Bissell is not disinterested or independent and is therefore incapable of considering a demand. Defendant Bissell co-founded the Company and has served as either its CEO or Co-CEO since its inception in 2008. Thus, the Company admits that Defendant Bissell is a non-independent director. Further, Defendant Bissell cannot be reasonably expected to consider with disinterestedness whether to sue fellow directors of a company that he founded and has helped to build from inception.

163.     Further, Defendant Bissell is not disinterested or independent because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

164.     Defendants Cook, Harvey, Rogerson, Stephanou, and Tripeny either currently serve, or served during the Relevant Period, as members of the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, the audits of the financial statements, and oversight with respect to the Company's risk management function and its legal and regulatory compliance. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants

cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

165.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

166.    All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Importantly, none of the Board's current members have taken remedial action to redress the conduct alleged herein.

167.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

168.    The acts complained of herein constitute violations of fiduciary duties owed by Origin's officers and directors, and these acts are incapable of ratification.

169.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers'

liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Origin. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Origin, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit because that would expose them to the loss of insurance coverage and personal liability for the wrongdoing alleged herein. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

170.    If there is no directors' and officers' liability insurance, then the directors will not cause Origin to sue the Defendants named herein, since, if they did, they would face large uninsured individual liabilities. Accordingly, demand is futile in that event as well.

171.    Thus, for all of the reasons set forth above, at least seven of Origin's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants for Violations of § 14(a)
### of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9)

172.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

173.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

174.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2023 Proxy filed

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

with the SEC. As alleged above, this filing contained materially false and misleading statements concerning the Company's risk oversight function and its internal controls.

175.    The 2023 Proxy was used to solicit shareholder votes in connection with the election of Defendants Fish, Drucker, Riley, and Tripeny to serve for another three-year term on the Company's Board. In addition, the 2023 Proxy was used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Bissell and Riley. While the shareholder vote with respect to executive compensation was non-binding, the 2023 Proxy indicated that "our management team, our board, and our Compensation Committee, which is responsible for designing and administering our executive compensation program, value the opinions expressed by our stockholders, and will consider the outcome of this vote when making future executive compensation decisions."

176.    With respect to the "main objectives of [Origin's] executive compensation program," the 2023 Proxy indicates that compensation is performance-based, stating that the Company "[e]mphasize[s] pay for performance, with a program that aligns financial and operational achievements."

177.    The materially false and misleading statements contained in the 2023 Proxy regarding the adequacy of the Company's risk oversight function and internal controls, therefore, misleadingly induced shareholders to vote in favor of the election of Defendants Fish, Drucker, Riley, and Tripeny, and performance-based compensation for Defendants Bissell and Riley, to which they were not entitled.

178.    The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

## COUNT II

### Against the Individual Defendants
### For Breach of Fiduciary Duty

179.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

180.    The Individual Defendants owed the Company fiduciary obligations. By reason of

their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

181. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

182. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and/or monitor adequate internal controls over the Company's financial reporting and, as a consequence, issued or permitted the issuance of materially false and misleading statements in the Company's SEC filings and in other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

183. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

184. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

185. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged,

facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

187.    Plaintiff, on behalf of Origin, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants
### For Unjust Enrichment

188.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

189.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Origin.

190.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Origin that were tied to the performance or artificially inflated valuation of Origin, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

191.    Plaintiff, as a shareholder and a representative of Origin, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

192.    Plaintiff, on behalf of Origin, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants
### For Abuse of Control

193.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

194.    The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

195.    As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

196.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT VII

### Against the Individual Defendants
### For Waste of Corporate Assets

197.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

198.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

199.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

200.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

201.    Plaintiff, on behalf Origin, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful

2  conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds,

3  and imposing a constructive trust thereon;

4       C.     Awarding punitive damages;

5       D.     Awarding costs and disbursements of this action, including reasonable attorneys'

6  fees, accountants' and experts' fees, costs, and expenses; and

7       E.     Granting such other and further relief as the Court deems just and proper.

8                                    **JURY DEMAND**

9       Plaintiff hereby demands a trial by jury.

10  Dated: March 7, 2025                        **WOLF HALDENSTEIN ADLER**
                                                **FREEMAN & HERZ LLP**
11
                                    By:   */s/ Alex J. Tramontano*
12                                        ALEX J. TRAMONTANO

13                                        Betsy C. Manifold (182450)
                                          Rachele R. Byrd (190634)
14                                        Alex J. Tramontano (276666)
                                          750 B Street, Suite 1820
15                                        San Diego, CA 92101
                                          Telephone: (619) 239-4599
16                                        Facsimile: (619) 234-4599
                                          Email: manifold@whafh.com
17                                        Email: byrd@whafh.com
                                          Email: tramontano@whafh.com
18
                                          **RIGRODSKY LAW, P.A.**
19                                        Timothy J. MacFall
                                          Samir Aougab
20                                        825 East Gate Boulevard, Suite 300
                                          Garden City, NY 11530
21                                        Telephone: (516) 683-3516
                                          Email: tjm@rl-legal.com
22                                        Email: sa@rl-legal.com

23                                        **GRABAR LAW OFFICES**
                                          Joshua H. Grabar
24                                        One Liberty Place
                                          1650 Market Street, Suite 3600
25                                        Philadelphia, PA 19103
                                          Telephone: (267) 507-6085
26                                        Email: jgrabar@grabarlaw.com

27                                        *Attorneys for Plaintiff*

28
                                    54
                     VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Docusign Envelope ID: 802D5B62-E4E2-42CE-B7F4-F0B42E48833D

## <u>VERIFICATION OF THOMAS KASPAR</u>

I, Thomas Kaspar, am a plaintiff in this action.  I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _3/4/2025_____

Signed by:

_____
Thomas Kaspar

2E052B7440AA4C0...