1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                           ----oo0oo----

11

12  In re ORIGIN MATERIALS, INC.,        No. 2:25-cv-777-WBS-JDP
    STOCKHOLDER DERIVATIVE LITIGATION
13                                        (Consolidated)

14                                        MEMORANDUM AND ORDER RE:
                                          PLAINTIFF'S UNOPPOSED MOTION
15                                        FOR PRELIMINARY APPROVAL OF
                                          DERIVATIVE ACTION SETTLEMENT
16

17                           ----oo0oo----

18
         Plaintiffs brought this shareholder derivative action
19
    against defendant Origin Materials, Inc., alleging violations of
20
    section 14(a) of the Securities Exchange Act of 1934 (15 U.S.C. §
21
    78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9).  (See Docket No.
22
    1 at 5.)  Plaintiffs have filed an unopposed motion for
23
    preliminary approval of derivative action settlement.  (See
24
    Docket No. 25-1.)
25
    I.   Background and Proposed Settlement
26
         This is one of four related cases assigned to the
27
    undersigned judge that involve claims under the Securities
28

                                    1

1  Exchange Act of 1934 against several of the same defendants based

2  on the same subject matter, namely the development and

3  construction of the Origin 2 plant.

4      Origin, which is headquartered in West Sacramento,

5  California, is a Delaware corporation "specializing in developing

6  and commercializing sustainable materials to replace traditional

7  petroleum-based materials used in various industries." (Docket

8  No. 25-1 at 10.)  On February 21, 2021, Origin announced a new

9  capital projects plan that involved the construction of "two

10 commercial-style plants": Origin 1 and Origin 2.  (Id.)  "Origin

11 1 was expected to be operational by the end of 2022.  Origin 2, a

12 significantly larger manufacturing plant, was expected to be

13 operational by mid-2025, and to supply the majority of the

14 Company's products from 2025 until 2027."  (Id.)

15     Plaintiffs' derivative claims "arise from allegations

16 that the Individual Defendants breached their fiduciary duties as

17 officers and directors of Origin by making and/or permitting the

18 issuance of materially false and misleading statements" and

19 failures to disclose certain problems in Origin's technological

20 processes and production capabilities.  (Id. at 10—11.)

21     Specifically, plaintiffs alleged that Origin failed to

22 disclose that: (1) "the Company was experiencing chemical fouling

23 issues 'at every step' of the process of converting CMF to PX at

24 commercial scale"; (2) "fouling issues were causing substantial

25 delays during the FEL 2 phase of the Origin 2 project"; (3) "the

26 Individual Defendants had been planning internally to scale down

27 production of PX at Origin 2 or to shift focus toward another

28 product"; (4) "the Individual Defendants had been planning

2

internally to split construction of Origin 2 into two phases";
(5) "the Company entered into a deal with Avantium N.V.
('Avantium') to produce FDCA at Origin 2 to compensate for the
Company's difficulties associated with producing PX at scale";
(6) "contrary to the timeline repeatedly disseminated by the
Individual Defendants, Avantium advised that it would take
several years before Origin 2 could become operational with
respect to production of FDCA"; (7) "despite representations
concerning the oversight responsibilities of Board and its
committees, neither adequately monitored the accuracy of the
public statements issued on behalf of, or concerning, the
Company"; (8) "Origin's internal controls over legal compliance,
including all laws and regulations governing the content of the
Company's public disclosures, were inadequate"; and (9) "as a
result, the positive statements concerning the Company's
business, operations, and prospects were materially misleading
and lacked a reasonable basis at all relevant times."  (Id.)
According to plaintiffs:

> When it was finally disclosed that Origin 2 would no
> longer produce PET derived from PX, instead focusing
> on producing PEF derived from FDCA, and that
> construction of Origin 2 would be broken up into two
> phases, with phase 1 expected to be operational by
> late-2026 or 2027 and phase 2 expected to be
> operational by 2028, on August 9, 2023, the price of
> Origin stock declined significantly.

(Id. at 11.)  Thereafter, litigation commenced.

        The parties propose settlement terms that include nine
areas of reform to Origin's corporate governance structures and
practices: (1) "Enhancement of the Board's Oversight functions"

3

1    (Id. at 14); (2) "Creation of a Board Operational Excellence

2    Committee" (Id. at 15); (3) "Amendments to Audit Committee

3    Responsibilities" ( Id. at 15—16); (4) "Maintaining a Management

4    Disclosure Committee" ( Id. at 16—17); (5) "Creation of a Chief

5    Compliance Officer" (Id. at 17); (6) "Creation of a Management

6    Product and Technology Committee" (Id. at 17—19); (7) "Executive

7    Reports" (Id. at 19); (8) "Cost Reduction Initiatives" ( Id. at

8    19); and (9) "Enhancements to the Whistleblower Policy" (Id. at

9    20—21).

10        According to plaintiffs, "the Reforms directly target

11   the alleged governance deficiencies that enabled the wrongdoing

12   alleged in the Derivative Matters" and , if approved, they "will

13   not only prevent recurrence of the wrongs alleged . . . but will

14   . . . generally strengthen Origin's corporate governance,

15   oversight, and internal controls." (Id. at 13.)  Moreover,

16   Origin agrees to "adopt, implement, and maintain the Reforms

17   within sixty days of an Order granting final approval of the

18   settlement" and has further agreed to "maintain the Reforms for

19   at least three (3) years." (Id.)

20   II.  Discussion

21        Federal Rule of Civil Procedure 23.1 provides that a

22   shareholder "derivative action may be settled, voluntarily

23   dismissed, or compromised only with the court's approval."  Fed.

24   R. Civ. P. 23.1(c).  "Rule 23 requires courts to employ a two-

25   step process in evaluating a class action or derivative action

26   settlement."  In re Wells Fargo & Co. Shareholder Derivative

27   Litig., No. 16-cv-05541-JST, 2019 WL 13020734, at *4 (N.D. Cal.

28   May 14, 2019).  Under Rule 23(e)(2), the court at step one "must

1    make a preliminary determination that the settlement is fair,

2    reasonable, and adequate." Id. (internal citation and quotations

3    omitted).  The court may approve the settlement only if it is

4    found to be "fundamentally fair, adequate, and reasonable." In

5    re Hewlett-Packard Co. S'holder Derivative Litig., No. 3:12-cv-

6    06003-CRB, 2015 WL 1153864, at *3 (N.D. Cal. Mar. 13, 2015)

7    (internal citation and quotations omitted).  "[I]f the court

8    preliminarily approves a derivative action settlement, notice

9    'must be given to shareholders or members in the manner that the

10   court orders.'"  In re Wells, 2019 WL 13020734, at *4 (quoting

11   Fed. R. Civ. P. 23.1(c)).  Only then will the court hold a

12   hearing in order to "make a final determination whether the

13   settlement is 'fair, reasonable, and adequate.'"  Id. (quoting

14   Fed. R. Civ. P. 23(e)(2)).

15         Courts consider a broad range of factors when

16   evaluating the "fairness, reasonableness, and adequacy" of a

17   proposed settlement in the context of a derivative action.  In re

18   Lyft, Inc. Derivative Litig., No. 20-cv-09257-HSG, 2024 WL

19   4505474, at *4 (N.D. Cal. Oct. 16, 2024).  Such factors include,

20   "the strength of the plaintiffs' case; the risk, expense,

21   complexity, and likely duration of further litigation; ... the

22   amount offered in settlement; the extent of discovery completed

23   and the stage of the proceedings; [and] the experience and views

24   of counsel ...."  In re Wells Fargo, 2019 WL 13020734, at *4

25   (internal citation and quotations omitted).  In addition, courts

26   consider "the extent of the benefit to be derived from the

27   proposed settlement by the corporation, the real party in

28   interest."  In re Pinterest Derivative Litig., No. 20-cv-08331-

5

WHA, 2022 WL 484961, *3 (N.D. Cal. Feb. 16, 2022) (internal citation and quotations omitted).  Importantly, the court must ensure that the proposed settlement is not "the product of fraud or overreaching by, or collusion between, the negotiating parties."  In re Hewlett-Packard, 2015 WL 1153864, at *3 (internal citation and quotation omitted); see also Lloyd v. Gupta, No. 15-cv-04183-MEJ, 2016 WL 3951652, at *4 (N.D. Cal. July 22, 2016) (internal citation and quotations omitted) (explaining that a court will take into account whether "the settlement is the result of arm's-length negotiations in which plaintiffs' counsel has effectively represented the interest of the shareholder class, and whether the substantive terms of the settlement are in the interests of [the company] and its shareholders relative to the likely rewards of litigation.").

At this preliminary approval stage, the court only needs to determine whether or not the proposed settlement is "within the range of possible approval."  In re Tableware Antitrust Litig., 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (internal citation and quotations omitted); see In re Wells Fargo, 2019 WL 13020734, at *4.

A.   Benefits to the Corporation

"The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest."  In re Apple Computer, Inc. Derivative Litig., No. 06-cv-4128-JF-(HRL), 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008) (internal citation and quotation omitted); see also Mego

1   *Financial Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).

2            Here, the proposed settlement consists primarily of

3   corporate governance reforms that the parties agree are designed

4   to achieve the following ends:

5       (1)  "[I]mprove Origin's risk oversight functions through
6            updates to the Board's oversight functions;"

7       (2)  "[E]nsure that the Company's manufacturing capabilities
8            and processes conform to its target production goals as
9            expressed in public statements;"

10      (3)  "[E]nhance the Audit Committees' risk oversight
11           responsibilities and capabilities;"

12      (4)  "[E]nsure that the Company's significant public
13           statements are reviewed for accuracy, integrity, and
             compliance with applicable laws and regulations as well
14           as GAAP and non-GAAP requirements, protocols, and
             procedures through the maintenance of a management-
15           level Disclosure Committee;"

16      (5)  "[E]nhance oversight of the Company's corporate
17           governance policies through the creation of a CCO
             position;"
18

19      (6)  "[I]mprove oversight of key technological initiatives
20           through the creation of a management-level Product and
             Technology Committee;"
21

22      (7)  "[P]rovide regular executive reports to the Board
             regarding the Company's financial condition and
23           business prospects;"

24      (8)  "[M]inimize costs to the Company in the near term
25           through cost reduction initiatives; and"

26      (9)  "[P]rotect and incentivize employees with legitimate
27           concerns regarding the Company's management to voice

28

7

1  
2      their concerns through updates to the Company's Whistleblower Policy."

3  (Docket No. 25-1 at 24.)  "[C]ourts have recognized that

4  corporate governance reforms ... provide valuable benefits to

5  public companies."  In re NVIDIA Corp. Derivative Litig., No. 06-

6  cv-06110-SBA-(JCS), 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22,

7  2008) (internal citation and quotations omitted).

8      The settlement here also fixes the proposed corporate

9  governance reforms in place for three years.  (Docket No. 25-1 at

10  24 n. 3).  In Cohn v. Nelson, the court found that corporate

11  governance measures included in a proposed settlement, when held

12  in place for at least three years, tend to "provide meaningful

13  ways of avoiding the problems [the company] experienced in the

14  recent past."  375 F.Supp.2d 844, 850 (E.D. Mo. 2005).  Courts

15  have also found that a "three-year commitment should enhance

16  consumer, investor, and employee trust in [the Corporation's]

17  corporate governance."  In re Lyft, 2024 WL 4505474 at *4.

18      "The reaction of shareholders also factors into

19  assessing the fairness of a settlement."  In re Pinterest

20  Derivative Litig., No. 20-cv-08331-WHA, 2022 WL 2079712, at *1

21  (N.D. Cal. June 9, 2022).  Consequently, "because potential

22  buyers of [the Corporation's] stock likely will view [the]

23  reforms as an additional reason to purchase the stock, this

24  three-year period should confer financial benefits to [the

25  Corporation]."  In re Lyft, 2024 WL 4505474 at *4 (internal

26  citation and quotation marks omitted); see also In re Rambus Inc.

27  Derivative Litig., No. 06-cv-3513-JF-(HRL), 2009 WL 166689 (N.D.

28  Cal. Jan. 20, 2009) ("The Settlement provides long term remedial

1    measures that are specifically designed to protect the

2    shareholders.").

3         Additionally, "without a settlement, Plaintiffs face[ ]

4    the prospect of additional or collateral litigation ... further

5    prolonging any resolution beneficial to [Origin]." In re Wells

6    Fargo, 2019 WL 13020734, at *6; see In re Apple Computer, Inc.,

7    2008 WL 4820784, at *3 (internal citation and quotations omitted)

8    ("[T]he risk, expense, complexity, and likely duration of further

9    litigation are additional factors that should be considered in

10   determining the fairness of a proposed settlement.").

11        Plaintiffs here acknowledge "the significant risk that

12   continued litigation may not lead to any recovery for Origin."

13   (Docket No. 25-1 at 25); see Basaraba v. Greenberg, No. 13-cv-

14   5061-PSG-(SHX), 2014 WL 12591677, at *3 (C.D. Cal. Nov. 10, 2014)

15   ("In the context of shareholder derivative litigation, even the

16   strongest cases have a very low likelihood of success due to the

17   myriad legal, procedural, and discovery protections afforded

18   director and officer defendants."); see also In re Pac. Enter.

19   Sec. Litig., 47 F.3d 373, 378 (9th Cir. 1995) ("[T]he odds of

20   winning a derivative lawsuit [are] extremely small.")  They argue

21   that "the uncertainties of further litigation demonstrate that

22   the proposed Settlement is within the range of approval and

23   warrants Court approval."  (Docket No. 25-1 at 25.)

24        In particular, plaintiffs recognize the difficulties

25   imposed by the heightened pleading standards in Rule 23.1 and

26   state that they were "mindful of the inherent challenges of

27   establishing demand futility."  (Id.); see In re Fab Universal

28   Corp. S'holder Derivative Litig., 148 F. Supp. 3d 277, 281-82

1  (S.D.N.Y. 2015) ("The doctrine of demand futility, the business

2  judgment rule, and the generally uncertain prospect of

3  establishing a breach of fiduciary duties combine to make

4  shareholder derivative suits an infamously uphill battle for

5  plaintiffs."); see also Kamen v. Kemper Fin. Servs. Inc., 500

6  U.S. 90, 96 (1991) (holding that "extraordinary conditions" are

7  required in order for a plaintiff to establish demand

8  futility.").

9       The proposed settlement bypasses these hurdles, aiming

10  to ensure that Origin does not miss out on the opportunity to

11  receive a benefit.  See In re AOL Time Warner S'holder Derivative

12  Litig., No. 02-cv-6302-(SWK), 2006 WL 2572114, at *5 (S.D.N.Y.

13  Sept. 6, 2006) ("Termination of the litigation at this stage of

14  the proceedings 'obviate[es] the expenditure of any future time

15  and expense in connection with this action,' and will allow the

16  Company to direct its full attention to its substantive

17  business.") (citation omitted).

18       At the step-one preliminary approval stage, then, the

19  court is persuaded that the benefits of the proposed settlement

20  are sufficient to justify granting of the preliminary approval.

21       B.    Adequacy of Negotiation

22       Courts are required to "ensure that the agreement is

23  not the product of fraud or overreaching by, or collusion

24  between, the negotiating parties."  In re NVIDIA, 2008 WL 5382544

25  at *2 (internal citation and quotations omitted).  However, "[a]n

26  initial presumption of fairness is usually involved if the

27  settlement is recommended by class counsel after arm's length

28  bargaining."  Urena v. Cent. California Almond Growers Assn., No.

1  1:18-cv-517-NONE-EPG, 2020 WL 3483280, at *11 (E.D. Cal. June 26,

2  2020), report and recommendation adopted, No. 1:18-cv-517-NONE-

3  EPG, 2020 WL 4593824 (E.D. Cal. Aug. 11, 2020) (quotation

4  omitted).  Additionally, "[t]he involvement of counsel with

5  significant experience in derivative litigation, who appear 'on

6  behalf of all parties,' weighs in favor of a non-collusive

7  settlement."  In re Lyft, 2024 WL 4505474 at *5 (citation

8  omitted).

9       Here, "Defendants were represented by esteemed counsel

10  from Freshfields US LLP."  (Docket No. 25-1 at 28.)  Plaintiffs

11  were likewise represented by counsel with significant experience

12  in derivative litigation.  (Docket No. 25-2 at 87—130.)

13  Plaintiffs assert that "counsel on both sides possessed a firm

14  understanding of the strengths and weaknesses of the claims and

15  defenses in the Derivative Matters."  (Docket No. 25-1 at 28—29

16  ("Specifically, prior to the Settlement, Settling Stockholders'

17  Counsel was well-informed about the legal and factual issues the

18  litigation posed as they conducted extensive research and

19  investigation into the claims and underlying issues in their

20  investigation.").)  This included, among other things,

21  significant research and investigation, preparation of a

22  settlement demand, "extensive settlement discussions with

23  [opposing] counsel," "the exchange of corporate governance reform

24  proposals and counteroffers," and "negotiating and drafting the

25  term sheet and subsequent settlement documentation for

26  presentment to the Court."  (Id. at 29.)

27       Here counsel assert that "[o]nly after reaching an

28  agreement in principle on the Reforms did the Settling Parties

1  discuss attorneys' fees." (Id.) Plaintiffs argue that the
2  proposed "Fee and Expense Amount of $700,000.00 . . . represents
3  a fair, reasonable, beneficial, and practical resolution of
4  highly uncertain litigation," and that the terms of the
5  settlement "fairly account for the risks and potential rewards of
6  the claims being settled." (Id.) "[T]he Parties agree that the
7  Settlement 'confers substantial benefits upon the Company and its
8  stockholders and that the adoption, implementation, and
9  maintenance of the Reforms are in the best interests of the
10 Company and its stockholders." (Id.)

11          "'Great weight' is accorded to the recommendation of
12 counsel, who are most closely acquainted with the facts of the
13 underlying litigation." Nat'l Rural Telecommunications Coop. v.
14 DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004) (citing In re
15 Painewebber Ltd. P'ships Litig., 171 F.R.D. 104, 125
16 (S.D.N.Y.1997)); see also Pac. Enters. Sec. Litig., 47 F.3d at
17 378 ("Parties represented by competent counsel are better
18 positioned than courts to produce a settlement that fairly
19 reflects each party's expected outcome in the litigation.").
20 Therefore, "the trial judge, absent fraud, collusion, or the
21 like, should be hesitant to substitute its own judgment for that
22 of counsel." Nat'l Rural Telecommunications Coop., 221 F.R.D. at
23 528 (citing Cotton v. Hinton, 559 F.2d 1326, 1330 (5th
24 Cir.1977)); see also Griffin v. Consol. Commc'ns, No. 2:21-cv-
25 885-WBS-KJN, 2023 WL 3853643, at *4 (E.D. Cal. June 6, 2023)
26 (Shubb, J.) ("Given counsel's representation that the settlement
27 reached was the product of arms-length bargaining following
28 extensive informal discovery and with the help of an experienced

1  mediator, this factor weighs in favor of final approval."); see

2  La Fleur v. Med. Mgmt. Int'l, Inc., No. 5:13-cv-00398, 2014 WL

3  2967475, at *4 (N.D. Cal. June 25, 2014) ("Settlements reached

4  with the help of a mediator are likely non-collusive.").

5      The court is therefore satisfied that the proposed

6  settlement falls within the range that may be approved.

7  III. Notice Plan

8      Once the court preliminarily approves the proposed

9  settlement in a derivative action, notice "must be given to

10 shareholders or members in the manner that the court orders."

11 Fed. R. Civ. P. 23.1(c). "The Court considers whether such

12 notice would be sufficient to reach the majority of interested

13 stockholders" when determining an appropriate method of notice as

14 part of its separate evaluation of the proposed notice procedure.

15 Bushansky v. Armacost, No. 12-cv-01597-JST, 2014 WL 2905143, at

16 *6 (N.D. Cal. June 25, 2014) (citation omitted).

17     Here, the parties agree to provide notice as follows:

18
19     Within fourteen (14) days after the Court's entry of
       the Preliminary Approval Order, the Notice shall be
20     provided through: (i) the filing of a Current Report
       on Form 8-K with the SEC by the Company, which shall
21     include as attachments the approved Settlement Notice
       and the Stipulation and exhibits thereto; (ii) the
22     publication of the Settlement Notice one time in
       *Investor's Business Daily* or www.investors.com; and
23     (iii) the posting of the SEC Form 8-K with the
       Settlement Notice, Stipulation and exhibits thereto on
24     the Investor Relations portion of the Company's
       website through the date of the Settlement Hearing."

25 (Docket No. 25-1 at 30—31.)

26
27     Courts have found that procedures similar to the ones

28 proposed here are sufficient to satisfy the requirements of both

13

1  Rule 23.1 and due process.  See In re Lyft, 2024 WL 4505474 at

2  *7; see In re Hewlett-Packard Co. S'holder Derivative Litig., 716

3  F. App'x 603, 608 (9th Cir. 2017) (upholding a district court's

4  approval of notice procedures that included the parties placing

5  notice in prominent publications and where the parties posted the

6  notice on the company's website); Bushansky, 2014 WL 2905143, at

7  *6 (collecting cases).  Here, the court reaches the same

8  conclusion.

9       Here, the court finds that the notice proposed by the

10  parties "describes the terms of the settlement in sufficient

11  detail to alert those with adverse viewpoints to investigate and

12  to come forward and be heard."  In re Hewlett-Packard, 716 F.

13  App'x at 609 (quoting Churchill Vill., L.L.C. v. Gen. Elec., 361

14  F.3d 566, 575 (9th Cir. 2004)).  The Notice summarizes and

15  explains in plain language the: (1) "facts and considerations

16  that caused the Parties and their respective counsel to conclude

17  that the proposed Settlement is fair, reasonable, adequate, and

18  in Origin's best interests"; (2) "procedure for objecting to the

19  proposed Settlement"; and (3) "date, place, and time of the

20  Settlement Hearing."  (Docket No. 25-1 at 30; see Docket No. 25-2

21  at 68—80.)  As such, the court is satisfied that the notice

22  process proposed in this settlement agreement is "reasonably

23  calculated, under all the circumstances, to apprise all

24  [shareholders] of the proposed settlement."  See Roes, 1-2 v.

25  SFBSC Mgmt., LLC, 944 F.3d 1035, 1045 (9th Cir. 2019) (internal

26  citation and quotations omitted).

27  IV.  Attorney's Fees

28       "[B]ecause of the danger that parties will overestimate

1  the value of injunctive relief in order to inflate fees, courts

2  must be particularly careful when ascribing value to injunctive

3  relief for purposes of determining attorneys' fees, and avoid

4  doing so altogether if the value of the injunctive relief is not

5  easily measurable." Roes, 944 F.3d at 1055. Here, the terms of

6  the proposed settlement provide for a fee and expense amount

7  totaling $700,000.00. (Docket No. 25-1 at 13.) That said, "the

8  Court need not—and does not—decide the issue of attorneys' fees

9  now." In re Lyft, 2024 WL 4505474 at *7. "Preliminary approval

10  of the settlement is not an endorsement or pre-approval of any

11  future fee request." Id.

12  V.  Conclusion

13      IT IS THEREFORE ORDERED that plaintiffs' unopposed

14  motion for preliminary approval of derivative settlement (Docket

15  No. 25-1) be, and the same hereby is, GRANTED.

16      IT IS FURTHER ORDERED THAT:

17      (1)  Within **14 days** following the entry of this Order,

18  Origin must (i) file with the SEC the Settlement Notice and

19  Stipulation (and exhibits thereto) as exhibits to a Current

20  Report on Form 8-K; (ii) publish the Settlement Notice in

21  Investor's Business Daily or www.investors.com; and (iii) post

22  the SEC Form 8-K with the Settlement Notice, Stipulation and

23  exhibits thereto on the Company's Investor Relations website

24  through the date of the Settlement Hearing.

25      (2)  At least **14 days** before the Settlement Hearing,

26  Origin must file proof that it complied with disseminating

27  Notice.

28      (3)  At least **28 days** before the Settlement Hearing,

15

1  plaintiffs must file their motion in support of final approval of

2  the settlement, application for the fee and expense award, and

3  service award for plaintiffs.

4          (4)   Current Origin stockholders must file any

5  objections to the settlement at least **21 days** prior to the

6  Settlement Hearing.

7          (5)   Any attorney retained by a current Origin

8  stockholder for the purpose of objecting must file a notice of

9  appearance at least **21 days** prior to the Settlement Hearing.

10          (6)   Any current Origin stockholder who intends to make

11  an appearance at the settlement hearing must file notice with the

12  court at least **21 days** prior to the Settlement Hearing.

13          (7)   At least **14 days** prior to the Settlement Hearing:

14  Deadline for Settling Parties to file and serve responses to any

15  objection from Origin stockholders.

16          (8)   The Settlement Hearing is set for **January 20,**

17  **2026,** at 1:30 p.m. in Courtroom No. 5.

18          IT IS SO ORDERED.

19  Dated:  November 24, 2025

20                                    WILLIAM B. SHUBB
                                      UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28

16