1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10                              ----oo0oo----

11

12   In re ORIGIN MATERIALS, INC.,        No. 2:25-cv-777-WBS-JDP
     STOCKHOLDER DERIVATIVE LITIGATION
13                                         (Consolidated)

14                                         AMENDED MEMORANDUM AND ORDER
                                           RE: PLAINTIFF'S UNOPPOSED
15                                         MOTION FOR PRELIMINARY
                                           APPROVAL OF DERIVATIVE ACTION
16                                         SETTLEMENT

17

18                              ----oo0oo----

19            Plaintiffs brought this shareholder derivative action

20   against defendant Origin Materials, Inc., alleging violations of

21   section 14(a) of the Securities Exchange Act of 1934 (15 U.S.C. §

22   78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9).  (See Docket No.

23   1 at 5.)  Plaintiffs have filed an unopposed motion for

24   preliminary approval of derivative action settlement.  (See

25   Docket No. 25-1.)

26   I.   Background and Proposed Settlement

27            This is one of four related cases assigned to the

28
                                    1

1  undersigned judge that involve claims under the Securities

2  Exchange Act of 1934 against several of the same defendants based

3  on the same subject matter, namely the development and

4  construction of the Origin 2 plant.

5          Origin, which is headquartered in West Sacramento,

6  California, is a Delaware corporation "specializing in developing

7  and commercializing sustainable materials to replace traditional

8  petroleum-based materials used in various industries." (Docket

9  No. 25-1 at 10.)  On February 21, 2021, Origin announced a new

10  capital projects plan that involved the construction of "two

11  commercial-style plants": Origin 1 and Origin 2.  (Id.)  "Origin

12  1 was expected to be operational by the end of 2022.  Origin 2, a

13  significantly larger manufacturing plant, was expected to be

14  operational by mid-2025, and to supply the majority of the

15  Company's products from 2025 until 2027."  (Id.)

16          Plaintiffs' derivative claims "arise from allegations

17  that the Individual Defendants breached their fiduciary duties as

18  officers and directors of Origin by making and/or permitting the

19  issuance of materially false and misleading statements" and

20  failures to disclose certain problems in Origin's technological

21  processes and production capabilities.  (Id. at 10—11.)

22          Specifically, plaintiffs alleged that Origin failed to

23  disclose that: (1) "the Company was experiencing chemical fouling

24  issues 'at every step' of the process of converting CMF to PX at

25  commercial scale"; (2) "fouling issues were causing substantial

26  delays during the FEL 2 phase of the Origin 2 project"; (3) "the

27  Individual Defendants had been planning internally to scale down

28  production of PX at Origin 2 or to shift focus toward another

2

product"; (4) "the Individual Defendants had been planning internally to split construction of Origin 2 into two phases"; (5) "the Company entered into a deal with Avantium N.V. ('Avantium') to produce FDCA at Origin 2 to compensate for the Company's difficulties associated with producing PX at scale"; (6) "contrary to the timeline repeatedly disseminated by the Individual Defendants, Avantium advised that it would take several years before Origin 2 could become operational with respect to production of FDCA"; (7) "despite representations concerning the oversight responsibilities of Board and its committees, neither adequately monitored the accuracy of the public statements issued on behalf of, or concerning, the Company"; (8) "Origin's internal controls over legal compliance, including all laws and regulations governing the content of the Company's public disclosures, were inadequate"; and (9) "as a result, the positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times."  (Id.) According to plaintiffs:

> When it was finally disclosed that Origin 2 would no longer produce PET derived from PX, instead focusing on producing PEF derived from FDCA, and that construction of Origin 2 would be broken up into two phases, with phase 1 expected to be operational by late-2026 or 2027 and phase 2 expected to be operational by 2028, on August 9, 2023, the price of Origin stock declined significantly.

(Id. at 11.)  Thereafter, litigation commenced.

The parties propose settlement terms that include nine areas of reform to Origin's corporate governance structures and

practices: (1) "Enhancement of the Board's Oversight functions" (Id. at 14); (2) "Creation of a Board Operational Excellence Committee" (Id. at 15); (3) "Amendments to Audit Committee Responsibilities" (Id. at 15—16); (4) "Maintaining a Management Disclosure Committee" (Id. at 16—17); (5) "Creation of a Chief Compliance Officer" (Id. at 17); (6) "Creation of a Management Product and Technology Committee" (Id. at 17—19); (7) "Executive Reports" (Id. at 19); (8) "Cost Reduction Initiatives" (Id. at 19); and (9) "Enhancements to the Whistleblower Policy" (Id. at 20—21).

According to plaintiffs, "the Reforms directly target the alleged governance deficiencies that enabled the wrongdoing alleged in the Derivative Matters" and , if approved, they "will not only prevent recurrence of the wrongs alleged . . . but will . . . generally strengthen Origin's corporate governance, oversight, and internal controls." (Id. at 13.)  Moreover, Origin agrees to "adopt, implement, and maintain the Reforms within sixty days of an Order granting final approval of the settlement" and has further agreed to "maintain the Reforms for at least three (3) years." (Id.)

II.  Discussion

Federal Rule of Civil Procedure 23.1 provides that a shareholder "derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23.1(c).  "Rule 23 requires courts to employ a two-step process in evaluating a class action or derivative action settlement."  In re Wells Fargo & Co. Shareholder Derivative Litig., No. 16-cv-05541-JST, 2019 WL 13020734, at *4 (N.D. Cal.

4

1   May 14, 2019).  Under Rule 23(e)(2), the court at step one "must
2   make a preliminary determination that the settlement is fair,
3   reasonable, and adequate."  Id. (internal citation and quotations
4   omitted).  The court may approve the settlement only if it is
5   found to be "fundamentally fair, adequate, and reasonable."  In
6   re Hewlett-Packard Co. S'holder Derivative Litig., No. 3:12-cv-
7   06003-CRB, 2015 WL 1153864, at *3 (N.D. Cal. Mar. 13, 2015)
8   (internal citation and quotations omitted).  "[I]f the court
9   preliminarily approves a derivative action settlement, notice
10  'must be given to shareholders or members in the manner that the
11  court orders.'"  In re Wells, 2019 WL 13020734, at *4 (quoting
12  Fed. R. Civ. P. 23.1(c)).  Only then will the court hold a
13  hearing in order to "make a final determination whether the
14  settlement is 'fair, reasonable, and adequate.'"  Id. (quoting
15  Fed. R. Civ. P. 23(e)(2)).

16         Courts consider a broad range of factors when
17  evaluating the "fairness, reasonableness, and adequacy" of a
18  proposed settlement in the context of a derivative action.  In re
19  Lyft, Inc. Derivative Litig., No. 20-cv-09257-HSG, 2024 WL
20  4505474, at *4 (N.D. Cal. Oct. 16, 2024).  Such factors include,
21  "the strength of the plaintiffs' case; the risk, expense,
22  complexity, and likely duration of further litigation; ... the
23  amount offered in settlement; the extent of discovery completed
24  and the stage of the proceedings; [and] the experience and views
25  of counsel ...."  In re Wells Fargo, 2019 WL 13020734, at *4
26  (internal citation and quotations omitted).  In addition, courts
27  consider "the extent of the benefit to be derived from the
28  proposed settlement by the corporation, the real party in

1  interest." _In re Pinterest Derivative Litig._, No. 20-cv-08331-
2  WHA, 2022 WL 484961, *3 (N.D. Cal. Feb. 16, 2022) (internal
3  citation and quotations omitted).  Importantly, the court must
4  ensure that the proposed settlement is not "the product of fraud
5  or overreaching by, or collusion between, the negotiating
6  parties." _In re Hewlett-Packard_, 2015 WL 1153864, at *3
7  (internal citation and quotation omitted); _see also_ _Lloyd v._
8  _Gupta_, No. 15-cv-04183-MEJ, 2016 WL 3951652, at *4 (N.D. Cal.
9  July 22, 2016) (internal citation and quotations omitted)
10 (explaining that a court will take into account whether "the
11 settlement is the result of arm's-length negotiations in which
12 plaintiffs' counsel has effectively represented the interest of
13 the shareholder class, and whether the substantive terms of the
14 settlement are in the interests of [the company] and its
15 shareholders relative to the likely rewards of litigation.").

16      At this preliminary approval stage, the court only
17 needs to determine whether or not the proposed settlement is
18 "within the range of possible approval."  _In re Tableware_
19 _Antitrust Litig._, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007)
20 (internal citation and quotations omitted); _see_ _In re Wells_
21 _Fargo_, 2019 WL 13020734, at *4.

22      A.    Benefits to the Corporation

23      "The principal factor to be considered in determining
24 the fairness of a settlement concluding a shareholders'
25 derivative action is the extent of the benefit to be derived from
26 the proposed settlement by the corporation, the real party in
27 interest." _In re Apple Computer, Inc. Derivative Litig._, No. 06-
28 cv-4128-JF-(HRL), 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008)

(internal citation and quotation omitted); see also Mego
Financial Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000).

Here, the proposed settlement consists primarily of
corporate governance reforms that the parties agree are designed
to achieve the following ends:

(1)   "[I]mprove Origin's risk oversight functions through
      updates to the Board's oversight functions;"

(2)   "[E]nsure that the Company's manufacturing capabilities
      and processes conform to its target production goals as
      expressed in public statements;"

(3)   "[E]nhance the Audit Committees' risk oversight
      responsibilities and capabilities;"

(4)   "[E]nsure that the Company's significant public
      statements are reviewed for accuracy, integrity, and
      compliance with applicable laws and regulations as well
      as GAAP and non-GAAP requirements, protocols, and
      procedures through the maintenance of a management-
      level Disclosure Committee;"

(5)   "[E]nhance oversight of the Company's corporate
      governance policies through the creation of a CCO
      position;"

(6)   "[I]mprove oversight of key technological initiatives
      through the creation of a management-level Product and
      Technology Committee;"

(7)   "[P]rovide regular executive reports to the Board
      regarding the Company's financial condition and
      business prospects;"

(8)   "[M]inimize costs to the Company in the near term
      through cost reduction initiatives; and"

(9)   "[P]rotect and incentivize employees with legitimate
      concerns regarding the Company's management to voice

7

1    their concerns through updates to the Company's
2    Whistleblower Policy."
3    (Docket No. 25-1 at 24.)  "[C]ourts have recognized that
4    corporate governance reforms ... provide valuable benefits to
5    public companies."  In re NVIDIA Corp. Derivative Litig., No. 06-
6    cv-06110-SBA-(JCS), 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22,
7    2008) (internal citation and quotations omitted).
8        The settlement here also fixes the proposed corporate
9    governance reforms in place for three years.  (Docket No. 25-1 at
10   24 n. 3).  In Cohn v. Nelson, the court found that corporate
11   governance measures included in a proposed settlement, when held
12   in place for at least three years, tend to "provide meaningful
13   ways of avoiding the problems [the company] experienced in the
14   recent past."  375 F.Supp.2d 844, 850 (E.D. Mo. 2005).  Courts
15   have also found that a "three-year commitment should enhance
16   consumer, investor, and employee trust in [the Corporation's]
17   corporate governance."  In re Lyft, 2024 WL 4505474 at *4.
18       "The reaction of shareholders also factors into
19   assessing the fairness of a settlement."  In re Pinterest
20   Derivative Litig., No. 20-cv-08331-WHA, 2022 WL 2079712, at *1
21   (N.D. Cal. June 9, 2022).  Consequently, "because potential
22   buyers of [the Corporation's] stock likely will view [the]
23   reforms as an additional reason to purchase the stock, this
24   three-year period should confer financial benefits to [the
25   Corporation]."  In re Lyft, 2024 WL 4505474 at *4 (internal
26   citation and quotation marks omitted); see also In re Rambus Inc.
27   Derivative Litig., No. 06-cv-3513-JF-(HRL), 2009 WL 166689 (N.D.
28   Cal. Jan. 20, 2009) ("The Settlement provides long term remedial

8

1  measures that are specifically designed to protect the

2  shareholders.").

3      Additionally, "without a settlement, Plaintiffs face[ ]

4  the prospect of additional or collateral litigation ... further

5  prolonging any resolution beneficial to [Origin]." In re Wells

6  Fargo, 2019 WL 13020734, at *6; see In re Apple Computer, Inc.,

7  2008 WL 4820784, at *3 (internal citation and quotations omitted)

8  ("[T]he risk, expense, complexity, and likely duration of further

9  litigation are additional factors that should be considered in

10  determining the fairness of a proposed settlement.").

11      Plaintiffs here acknowledge "the significant risk that

12  continued litigation may not lead to any recovery for Origin."

13  (Docket No. 25-1 at 25); see Basaraba v. Greenberg, No. 13-cv-

14  5061-PSG-(SHX), 2014 WL 12591677, at *3 (C.D. Cal. Nov. 10, 2014)

15  ("In the context of shareholder derivative litigation, even the

16  strongest cases have a very low likelihood of success due to the

17  myriad legal, procedural, and discovery protections afforded

18  director and officer defendants."); see also In re Pac. Enter.

19  Sec. Litig., 47 F.3d 373, 378 (9th Cir. 1995) ("[T]he odds of

20  winning a derivative lawsuit [are] extremely small.")  They argue

21  that "the uncertainties of further litigation demonstrate that

22  the proposed Settlement is within the range of approval and

23  warrants Court approval."  (Docket No. 25-1 at 25.)

24      In particular, plaintiffs recognize the difficulties

25  imposed by the heightened pleading standards in Rule 23.1 and

26  state that they were "mindful of the inherent challenges of

27  establishing demand futility."  (Id.); see In re Fab Universal

28  Corp. S'holder Derivative Litig., 148 F. Supp. 3d 277, 281-82

1  (S.D.N.Y. 2015) ("The doctrine of demand futility, the business

2  judgment rule, and the generally uncertain prospect of

3  establishing a breach of fiduciary duties combine to make

4  shareholder derivative suits an infamously uphill battle for

5  plaintiffs."); see also Kamen v. Kemper Fin. Servs. Inc., 500

6  U.S. 90, 96 (1991) (holding that "extraordinary conditions" are

7  required in order for a plaintiff to establish demand

8  futility.").

9      The proposed settlement bypasses these hurdles, aiming

10  to ensure that Origin does not miss out on the opportunity to

11  receive a benefit.  See In re AOL Time Warner S'holder Derivative

12  Litig., No. 02-cv-6302-(SWK), 2006 WL 2572114, at *5 (S.D.N.Y.

13  Sept. 6, 2006) ("Termination of the litigation at this stage of

14  the proceedings 'obviate[es] the expenditure of any future time

15  and expense in connection with this action,' and will allow the

16  Company to direct its full attention to its substantive

17  business.") (citation omitted).

18      At the step-one preliminary approval stage, then, the

19  court is persuaded that the benefits of the proposed settlement

20  are sufficient to justify granting of the preliminary approval.

21      B.    Adequacy of Negotiation

22      Courts are required to "ensure that the agreement is

23  not the product of fraud or overreaching by, or collusion

24  between, the negotiating parties."  In re NVIDIA, 2008 WL 5382544

25  at *2 (internal citation and quotations omitted).  However, "[a]n

26  initial presumption of fairness is usually involved if the

27  settlement is recommended by class counsel after arm's length

28  bargaining."  Urena v. Cent. California Almond Growers Assn., No.

1  1:18-cv-517-NONE-EPG, 2020 WL 3483280, at *11 (E.D. Cal. June 26,

2  2020), report and recommendation adopted, No. 1:18-cv-517-NONE-

3  EPG, 2020 WL 4593824 (E.D. Cal. Aug. 11, 2020) (quotation

4  omitted).  Additionally, "[t]he involvement of counsel with

5  significant experience in derivative litigation, who appear 'on

6  behalf of all parties,' weighs in favor of a non-collusive

7  settlement."  In re Lyft, 2024 WL 4505474 at *5 (citation

8  omitted).

9       Here, "Defendants were represented by esteemed counsel

10  from Freshfields US LLP."  (Docket No. 25-1 at 28.)  Plaintiffs

11  were likewise represented by counsel with significant experience

12  in derivative litigation.  (Docket No. 25-2 at 87—130.)

13  Plaintiffs assert that "counsel on both sides possessed a firm

14  understanding of the strengths and weaknesses of the claims and

15  defenses in the Derivative Matters."  (Docket No. 25-1 at 28—29

16  ("Specifically, prior to the Settlement, Settling Stockholders'

17  Counsel was well-informed about the legal and factual issues the

18  litigation posed as they conducted extensive research and

19  investigation into the claims and underlying issues in their

20  investigation.").)  This included, among other things,

21  significant research and investigation, preparation of a

22  settlement demand, "extensive settlement discussions with

23  [opposing] counsel," "the exchange of corporate governance reform

24  proposals and counteroffers," and "negotiating and drafting the

25  term sheet and subsequent settlement documentation for

26  presentment to the Court."  (Id. at 29.)

27       Here counsel assert that "[o]nly after reaching an

28  agreement in principle on the Reforms did the Settling Parties

1    discuss attorneys' fees." (Id.) Plaintiffs argue that the

2    proposed "Fee and Expense Amount of $700,000.00 . . . represents

3    a fair, reasonable, beneficial, and practical resolution of

4    highly uncertain litigation," and that the terms of the

5    settlement "fairly account for the risks and potential rewards of

6    the claims being settled." (Id.) "[T]he Parties agree that the

7    Settlement 'confers substantial benefits upon the Company and its

8    stockholders and that the adoption, implementation, and

9    maintenance of the Reforms are in the best interests of the

10   Company and its stockholders." (Id.)

11        "'Great weight' is accorded to the recommendation of

12   counsel, who are most closely acquainted with the facts of the

13   underlying litigation." Nat'l Rural Telecommunications Coop. v.

14   DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004) (citing In re

15   Painewebber Ltd. P'ships Litig., 171 F.R.D. 104, 125

16   (S.D.N.Y.1997)); see also Pac. Enters. Sec. Litig., 47 F.3d at

17   378 ("Parties represented by competent counsel are better

18   positioned than courts to produce a settlement that fairly

19   reflects each party's expected outcome in the litigation.").

20   Therefore, "the trial judge, absent fraud, collusion, or the

21   like, should be hesitant to substitute its own judgment for that

22   of counsel." Nat'l Rural Telecommunications Coop., 221 F.R.D. at

23   528 (citing Cotton v. Hinton, 559 F.2d 1326, 1330 (5th

24   Cir.1977)); see also Griffin v. Consol. Commc'ns, No. 2:21-cv-

25   885-WBS-KJN, 2023 WL 3853643, at *4 (E.D. Cal. June 6, 2023)

26   (Shubb, J.) ("Given counsel's representation that the settlement

27   reached was the product of arms-length bargaining following

28   extensive informal discovery and with the help of an experienced

1  mediator, this factor weighs in favor of final approval."); see

2  La Fleur v. Med. Mgmt. Int'l, Inc., No. 5:13-cv-00398, 2014 WL

3  2967475, at *4 (N.D. Cal. June 25, 2014) ("Settlements reached

4  with the help of a mediator are likely non-collusive.").

5        The court is therefore satisfied that the proposed

6  settlement falls within the range that may be approved.

7  III. Notice Plan

8        Once the court preliminarily approves the proposed

9  settlement in a derivative action, notice "must be given to

10  shareholders or members in the manner that the court orders."

11  Fed. R. Civ. P. 23.1(c).  "The Court considers whether such

12  notice would be sufficient to reach the majority of interested

13  stockholders" when determining an appropriate method of notice as

14  part of its separate evaluation of the proposed notice procedure.

15  Bushansky v. Armacost, No. 12-cv-01597-JST, 2014 WL 2905143, at

16  *6 (N.D. Cal. June 25, 2014) (citation omitted).

17        Here, the parties agree to provide notice as follows:

18              Within fourteen (14) days after the Court's
          entry of the Preliminary Approval Order, the Notice
19        shall be provided through: (i) the filing of a Current
          Report on Form 8-K with the SEC by the Company, which
20        shall include as attachments the approved Settlement
          Notice and the Stipulation and exhibits thereto; (ii)
21        the publication of the Settlement Notice one time in
          PR Newswire or a similar press release service; and
22        (iii) the posting of the SEC Form 8-K with the
          Settlement Notice, Stipulation and exhibits thereto on
23        the Investor Relations portion of the Company's
          website through the date of the Settlement Hearing."
24

25  (Docket No. 25-1 at 30—31.)

26        Courts have found that procedures similar to the ones

27  proposed here are sufficient to satisfy the requirements of both

28

                                13

Rule 23.1 and due process.  See In re Lyft, 2024 WL 4505474 at

*7; see In re Hewlett-Packard Co. S'holder Derivative Litig., 716

F. App'x 603, 608 (9th Cir. 2017) (upholding a district court's

approval of notice procedures that included the parties placing

notice in prominent publications and where the parties posted the

notice on the company's website); Bushansky, 2014 WL 2905143, at

*6 (collecting cases).  Here, the court reaches the same

conclusion.

Here, the court finds that the notice proposed by the

parties "describes the terms of the settlement in sufficient

detail to alert those with adverse viewpoints to investigate and

to come forward and be heard."  In re Hewlett-Packard, 716 F.

App'x at 609 (quoting Churchill Vill., L.L.C. v. Gen. Elec., 361

F.3d 566, 575 (9th Cir. 2004)).  The Notice summarizes and

explains in plain language the: (1) "facts and considerations

that caused the Parties and their respective counsel to conclude

that the proposed Settlement is fair, reasonable, adequate, and

in Origin's best interests"; (2) "procedure for objecting to the

proposed Settlement"; and (3) "date, place, and time of the

Settlement Hearing."  (Docket No. 25-1 at 30; see Docket No. 25-2

at 68—80.)  As such, the court is satisfied that the notice

process proposed in this settlement agreement is "reasonably

calculated, under all the circumstances, to apprise all

[shareholders] of the proposed settlement."  See Roes, 1-2 v.

SFBSC Mgmt., LLC, 944 F.3d 1035, 1045 (9th Cir. 2019) (internal

citation and quotations omitted).

IV.  Attorney's Fees

"[B]ecause of the danger that parties will overestimate

1  the value of injunctive relief in order to inflate fees, courts

2  must be particularly careful when ascribing value to injunctive

3  relief for purposes of determining attorneys' fees, and avoid

4  doing so altogether if the value of the injunctive relief is not

5  easily measurable." Roes, 944 F.3d at 1055.  Here, the terms of

6  the proposed settlement provide for a fee and expense amount

7  totaling $700,000.00. (Docket No. 25-1 at 13.)  That said, "the

8  Court need not—and does not—decide the issue of attorneys' fees

9  now." In re Lyft, 2024 WL 4505474 at *7.  "Preliminary approval

10  of the settlement is not an endorsement or pre-approval of any

11  future fee request." Id.

12  V.   Conclusion

13      IT IS THEREFORE ORDERED that plaintiffs' unopposed

14  motion for preliminary approval of derivative settlement (Docket

15  No. 25-1) be, and the same hereby is, GRANTED.

16      IT IS FURTHER ORDERED THAT:

17      (1)  Within **14 days** following the entry of this Order,

18  Origin must (i) file with the SEC the Settlement Notice and

19  Stipulation (and exhibits thereto) as exhibits to a Current

20  Report on Form 8-K; (ii) publish the Settlement Notice in *PR*

21  *Newswire* or a similar press release service; and (iii) post the

22  SEC Form 8-K with the Settlement Notice, Stipulation and exhibits

23  thereto on the Company's Investor Relations website through the

24  date of the Settlement Hearing.

25      (2)  At least **14 days** before the Settlement Hearing,

26  Origin must file proof that it complied with disseminating

27  Notice.

28      (3)  At least **28 days** before the Settlement Hearing,

1    plaintiffs must file their motion in support of final approval of

2    the settlement, application for the fee and expense award, and

3    service award for plaintiffs.

4         (4)  Current Origin stockholders must file any

5    objections to the settlement at least **21 days** prior to the

6    Settlement Hearing.

7         (5)  Any attorney retained by a current Origin

8    stockholder for the purpose of objecting must file a notice of

9    appearance at least **21 days** prior to the Settlement Hearing.

10        (6)  Any current Origin stockholder who intends to make

11   an appearance at the settlement hearing must file notice with the

12   court at least **21 days** prior to the Settlement Hearing.

13        (7)  At least **14 days** prior to the Settlement Hearing:

14   Deadline for Settling Parties to file and serve responses to any

15   objection from Origin stockholders.

16        (8)  The Settlement Hearing is set for **January 20,**

17   **2026,** at 1:30 p.m. in Courtroom No. 5.

18        IT IS SO ORDERED.

19   Dated:  November 26, 2025

20                         WILLIAM B. SHUBB
                           UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28

                              16