BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiffs*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORIGIN MATERIALS, INC. STOCKHOLDER DERIVATIVE LITIGATION | Case No.: 2:25-CV-00777-WBS-JDP <br><br> (Consolidated with Case No. 2:25-CV-00331) <br><br> **PLAINTIFFS' NOTICE OF MOTION AND UNOPPOSED MOTION FOR APPROVAL OF THE AGREED-TO FEE AND EXPENSE AMOUNT AND SERVICE AWARDS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Hearing Date:  January 20, 2026 <br> Hearing Time:  1:30 p.m. <br> Courtroom No.:  5 |

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................1

II.    Argument ...........................................................................................................3

    A.    The Request for the Award of Agreed-to Attorneys' Fees and Expenses is Reasonable and Should be Approved ..............................................................3

    B.    The Request for the Reimbursement of Expenses and Approval of the Service Awards should be granted..............................................................................15

III.    Conclusion .......................................................................................................16

**TABLE OF AUTHORITIES**

**Cases**

*Allred on behalf of Aclaris Therapeutics, Inc. v. Walker*, 2021 U.S. Dist. LEXIS 236249
(S.D.N.Y. Dec. 9, 2021)..................................................................................................10

*Basaraba v. Greenberg*, 2014 U.S. Dist. LEXIS 207414 (C.D. Cal. Nov. 10, 2014) ......................8

*Chrysler Corp. v. Dann*, 223 A.2d 384 (Del. 1966).........................................................13

*Cohn v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005) ................................................6, 14

*Davydov v. Roberts, et al.*, C.A. 2021-0415-SG (Del. Ch.).............................................12

*Elias v. Ungar's Food Products, Inc.*, 2013 U.S. Dist. LEXIS 203851 (D.N.J. Jan. 28, 2013)......11

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ................................................................10

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011)................................2, 14

*In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327 (D.N.J. 2002) ........................15

*In re Davita Healthcare Partners, Inc. Derivative Litig.*, 2015 U.S. Dist. LEXIS 74372
(D. Colo. June 5, 2015)...................................................................................................6

*In re Fab Universal Corp. S'holder Derivative Litig.*, 148 F. Supp. 3d 277 (S.D.N.Y. 2015) .......14

*In re Franklin Wireless Corp. Derivative Litig.*, Case No. 21-CV-1837 BEN (MSB)
(S.D. Cal.) .......................................................................................................................8

*In re Inovio Pharmaceuticals, Inc. Derivative Litig.*, Lead Case No. 2:20-cv-01962-GJP
(E.D. Pa.)........................................................................................................................12

*In re Maxwell Techs., Inc.*, 2015 U.S. Dist. LEXIS 189165 (S.D. Cal. 2015) ........................13, 14

*In re NVIDIA Corp. Derivative Litig.*, 2009 U.S. Dist. LEXIS 24973
(N.D. Cal. Dec. 22, 2008) .............................................................................................13

*In re OSI Sys., Inc. Derivative Litig.*, 2017 U.S. Dist. LEXIS 221033 (C.D. Cal.) ........................15

*In re Plains Res., Inc. S'holders Litig.*, 2005 Del. Ch. LEXIS 12 (Feb. 4, 2005)............................13

*In re Schering-Plough/Merck Merger Litigation*, 2010 U.S. Dist. LEXIS 29121
(D.N.J. Mar. 26, 2010).................................................................................................11

*In re Taronis Techs., Inc. S'holder Derivative Litig.*, 2021 U.S. Dist. LEXIS 42174
(D. Ariz. Mar. 5, 2021) .............................................................................3, 6, 10, 15

*In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F. Supp. 3d 508
(N.D. Cal. 2020), *aff'd*, 845 F. App'x 563 (9th Cir. 2021) .......................................................13, 14

*In re Zuora Derivative Litig.*, Case No. 3:19-cv-05701-SI, (N.D. Cal., Sept. 18, 2023)................12

*Maher v. Zapata Corp.*, 714 F.2d 436 (5th Cir. 1983)..........................................................................6

*McAlarnen v. Swift Transp. Co., Inc.*, 2010 U.S. Dist. LEXIS 7877 (E.D. Pa. Jan. 29, 2010) .......11

*Nixon-Crenshaw v. Coley*, Case No. 1:18-cv-25289-AHS (S.D. Fla. Sep. 30, 2021) .....................11

*Nixon-Crenshaw v. Coley*, Case No. 1:18-cv-25289-AHS (S.D. Fla. Sep. 30, 2021), ....................11

*Officers for Just. v. Civil Service Com.*, 688 F.2d 615 (9th Cir. 1982).........................................8, 9

*Sauby v. City of Fargo*, 2009 U.S. Dist. LEXIS 70270 (D.N.D. July 16, 2009) .............................15

*Shapiro v. JPMorgan Chase & Co.,* 2014 U.S. Dist. LEXIS 37872 (S.D.N.Y. Mar. 24, 2014) .....10

*Unite Nat'l Ret. Fund v. Watts*, 2005 WL 2877899 (D.N.J. Oct. 28, 2005) ....................................6

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) .......................................................3, 14

*Weber v. Government Employees Ins. Co.*, 262 F.R.D. 431 (D.N.J. 2009) ....................................11

**Rules**

E.D. Cal. R. 7 .........................................................................................................................................1

Fed. R. Civ. P. 23 ...................................................................................................................................1

**TO ALL PARTIES AND COUNSEL OF RECORD, PLEASE TAKE NOTICE:**

Pursuant to Fed. R. Civ. P. 23.1 and Local Rule 7 of this District, Plaintiffs Thomas Kasper ("Kasper") and Travis Tanasse ("Tanasse," together with Kaspar, "Plaintiffs") in the above-captioned consolidated shareholder derivative action (the "Derivative Action") brought on behalf of Nominal Defendant Origin Materials, Inc. ("Origin" or the "Company"), respectfully move this Court for entry of an Order granting final approval of the Fee and Expense Amount and Service Awards as set forth in the Stipulation[1] entered between and among the Settling Parties to the Derivative Matters (defined below) (the "Motion").

This Motion seeks an order (the "Final Approval Order") granting approval of the Fee and Expense Amount and Service Awards.[2] For the reasons set forth in the Stipulation, this Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Timothy J. MacFall, dated December 28, 2025 (the "MacFall Declaration" or "MacFall Decl."), and exhibits thereto, the Declaration of Daniel J. Morrisey, dated December 17, 2025 (the "Morrissey Declaration" or "Morrissey Decl."), Plaintiffs respectfully submit that the agreed-to Fee and Expense Amount and Service Awards are reasonable and should be approved by the Court. Defendants do not oppose the relief sought by this Motion. *See* Stip., § V, ¶ 4.1.

## MEMORANDUM AND POINTS OF AUTHORITIES

### I.   INTRODUCTION

After several months of negotiations, the Settling Parties have reached an agreement that settles the derivative claims asserted on behalf of Origin alleged in the Derivative Action, as well as those brought through a pre-suit litigation demand on the Company's Board of Directors, served by shareholder Randell Yaden on March 4, 2025 (the "Demand" and, with the Derivative Action, the "Derivative Matters"). MacFall Decl., ¶ 1.

---

[1]   All capitalized terms herein, unless otherwise noted, shall have the same definitions as set forth in the Stipulation filed with the Court on October 17, 2025. ECF No. 25-2.

[2]   The Settling Parties' proposed Order and Final Judgment in the attached as Exhibit D to the Stipulation, is also filed concurrently herewith.

PLAINTIFFS' UNOPPOSED MOTION & MPA   1   Case No.: 2:25-CV-00777-WBS-JDP
FOR AWARD OF AGREED-TO FEE AND
EXPENSE AMOUNT AND SERVICE AWARDS

The Derivative Matters allege, in substance, that the Individual Defendants, *inter alia*, made and/or caused Origin to make misrepresentations regarding the Company's business, operations, and prospects concerning the construction, timeline, cost, feasibility of scale, and operations of a new production plant, as well as Origin's ability to meet demand for manufactured product. As discussed more fully in Plaintiffs' Unopposed Motion for Final Approval of Settlement, Origin's Board has agreed to resolve the Derivative Matters by implementing the substantial and robust corporate governance reforms (the "Reforms") to remediate the internal control deficiencies that Settling Stockholders allege to have caused and/or enabled the wrongful conduct, and to maintain those Reforms for three (3) years.

Significantly, Origin's Board, including its independent directors, advised by counsel and in the exercise of its business judgment, by unanimous resolution, acknowledged and agreed that that the Settlement, and the Reforms it provides, confer substantial benefits upon Origin and its stockholders. Stip., §§ IV.  Additionally, Defendants, including Nominal Defendant Origin (Stip., § IV, ¶ 1.6), "agree that the ***pendency, prosecution, and settlement of the Derivative Matters and the efforts of Settling Stockholders' Counsel were a material and substantial cause of adoption and implementation of the Reforms*** which confer substantial benefits on Origin and its stockholders."[3] In consideration of those substantial benefits, Defendants' insurers agreed to pay the $700,000 Fee and Expense Amount to Settling Stockholders' Counsel. Stip., §V, ¶¶ 4.1, 19.12. Moreover, "Origin represents and acknowledges that ***it is receiving consideration through the Stipulation that provides it reasonably equivalent value for the terms and conditions imposed on Origin through the Stipulation***" (Stip., § V, 19.12), which includes the payment of the agreed upon Fee and Expense Amount. *Id.*, ¶ 4.1.

As discussed more fully below, the Settling Stockholders' request for approval of the Fee and Expense Amount readily satisfies the factors routinely considered by the courts to determine the reasonableness of an attorneys' fees application, namely: (1) the results achieved, (2) the risk of litigation, (3) the skill required and quality of work, and (4) the contingent nature of the fee and the

---

[3]    All emphasis is added unless otherwise noted.

financial burden carried by the Settling Stockholders' Counsel. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941-42 (9th Cir. 2011); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002). The reasonableness of the Fee and Expense Amount is  further confirmed by the lodestar of Settling Stockholders' Counsel, reflecting the extensive time, effort, and expense expended to secure the substantial benefits of the Reforms provided by the Settlement. Likewise, the expenses incurred here are typical of those found to be necessary and reasonable in similar litigation and, therefore, should be approved. Finally, the Service Awards to the Plaintiffs Silva and Tanasse, as well as Origin Stockholder Yaden, which will be paid out of the Fee and Expense Amount, are consistent with those approved in this Circuit for the efforts expended to obtain the benefits provided in similar shareholder derivative settlements and, therefore, they should also be approved. Accordingly, Plaintiffs respectfully submit that the Fee and Expense Amount, as well as the Service Awards should be approved by the Court.

## II.    ARGUMENT[4]

### A.    THE REQUEST FOR THE AWARD OF AGREED-TO FEE AND EXPENSE AMOUNT IS REASONABLE AND SHOULD BE APPROVED

#### 1. The Settlement Confers Substantial Benefits on the Company and was Negotiated at Arm's Length by the Settling Parties

"Attorneys who prosecute a shareholder derivative action that confers 'substantial benefit' on the corporation are entitled to an award of attorneys' fees." *In re Taronis Techs., Inc. S'holder Derivative Litig.*, 2021 U.S. Dist. LEXIS 42174, at *9 (D. Ariz. Mar. 5, 2021). Here, the Company acknowledges and agrees that the Reforms confer substantial benefits to Origin and Origin's shareholders. Stip., §V, ¶ 3.3. The results achieved in the Settlement, therefore, strongly support approval of the Fee and Expense Amount.

---

[4]    To avoid undue repetition, Plaintiffs incorporate by reference the factual background in the Memorandum of Points and Authorities in Support of Unopposed Motion for Preliminary Approval of Settlement of Derivative Action, the Declaration of Timothy J. MacFall,  dated October 17, 2025, submitted therewith (ECF Nos. 25-1 at 3-6; 25-2), and the MacFall Declaration submitted concurrently herewith.

PLAINTIFFS' UNOPPOSED MOTION & MPA          3          Case No.: 2:25-CV-00777-WBS-JDP
FOR AWARD OF AGREED-TO FEE AND
EXPENSE AMOUNT AND SERVICE AWARDS

As more fully discussed in the Approval Memorandum, the Reforms to be adopted, implemented, and maintained for three (3) years if the Settlement is approved, provide robust comprehensive corporate governance reforms that, among other things, specifically target and remediate the governance deficiencies which caused and/or enabled the wrongdoing alleged in the Derivative Matters. In the opinion of Plaintiffs' corporate governance expert, Professor Daniel J. Morrissey, the Settlement provides "significant improvements to the Company's corporate governance" through "the implementation of policies and procedures designed to ensure adequate oversight of the Company's operations by Origin's board of directors (the 'Board')." Declaration of Daniel J. Morrissey, dated December 17, 2025 (the "Morrissey Declaration" or "Morrissey Decl."), ¶ 4. Summarizing the Reforms, Professor Morrissey states that they "are very meaningful and constitute a significant and much needed retooling of Origin's corporate governance, internal controls, and oversight systems." *Id*., ¶ 32. Moreover, the policies and procedures established by the Reforms substantially reduce – if not eliminate – the likelihood of any recurrence of similar misconduct in the future: "[t]his Action has achieved a strong Settlement involving significant reforms to Origin's corporate governance. They are designed to make sure the deceptive conduct described in this litigation does not happen again." Morrissey Decl., ¶ 5.

Central to the governance changes effected by the Reforms is a significant overhaul of the oversight capabilities of the Board and the implementation of rigorous processes to ensure the Board's diligent review of material information provided to the markets and Company stockholders prior to approval and dissemination. As discussed at length in the Memorandum of Points and Authorities in Support of Final Approval of the Settlement (the "Approval Memorandum"), the Reforms require the Board's ***prior review and approval*** of all public statements concerning prospective financial guidance and operational information, including enterprise risk and non-financial metrics.[5]  Stip., Ex. A, ¶¶ 2.a-b. To ensure the adequacy of that process, the Board must review the "***detailed basis for each element***" of that financial guidance and/or operational information in conjunction with management prior to approval. *Id*. In addition, the CFO must

---

[5] Except as otherwise noted, all emphasis is added.

PLAINTIFFS' UNOPPOSED MOTION & MPA
FOR AWARD OF AGREED-TO FEE AND
EXPENSE AMOUNT AND SERVICE AWARDS

4

Case No.: 2:25-CV-00777-WBS-JDP

provide a written briefing at each regularly scheduled Board meeting about the Company's financial condition and business prospects, including the cause of any material increases in expenses and liabilities, or material decreases in revenues and earnings. The CFO briefing must also provide information concerning the effect of the Company's current financial condition on Origin's financial guidance, and the specific reasons, if applicable, why the Company may fail or has failed to meet such guidance. Stip., Ex. A, ¶¶ 8.a-b.  Such information is critical for a well-functioning board. *See* MacFall Decl., Ex. __ (Walter J. Salmon, *Crisis Prevention: How to Gear up Your Board*, HBR, Reprint 93106 (Jan.-Feb. 1993) (among information found helpful to make "outside directors full partners in board discussions" is monthly financial data, such as "management briefs that explain variations [in operating statements] ... from plan, including a revised forecast for the rest of the year."). These Reforms ensure that the Board receives the detailed information necessary to assess the accuracy of statements containing critical information regarding the Company's financial condition, operations, and business prospects before disclosure before public disclosure.

Following its review, the Reforms require that the Board memorialize its approval of such statements prior to disclosure in minutes and a resolution that the information and/or guidance "have ***a good faith basis***." Stip., Ex. A, ¶¶ 8.a-b.  To maintain the integrity of the Company's disclosure process – which, in turn, affects the Company's credibility with the market – the Reforms require that the Board promptly cause the issuance of a public corrective statement or disclosure if it "becomes aware of information or events that materially affect or alter any financial guidance, operational information, projections, or non-financial metrics" previously issued. *Id*., ¶ 2.c.

These Reforms, which enable the Board to not only better assess the accuracy of the public statements made by, or on behalf of, Origin but, if necessary, require it to act preserve the integrity of its public statements, are critical to restoring confidence in the Company.[6] *See* MacFall Decl., ¶¶

---

[6]    As discussed in the accompanying Approval Memorandum, other Reforms provided by the Settlement also ensure that Board receives timely accurate information and require other changes that significantly strengthen the Company's corporate governance and/or benefit Origin. *See* Stip., Ex. A, ¶¶ 2.a, 3.a-f, 4.a-b, 5.a-h, 6.a-c, 7.a-d, 9.a, 10.a-e.

PLAINTIFFS' UNOPPOSED MOTION & MPA          5          Case No.: 2:25-CV-00777-WBS-JDP
FOR AWARD OF AGREED-TO FEE AND
EXPENSE AMOUNT AND SERVICE AWARDS

40-42; Ex. 4 (Anand Narasimhan, Shruti Bajpai, *Governance at Theranos (A): A Blindsided Board*, Int'l. Institute for Management Development, IMD-2667 (June 26, 2025)).

Because the Reforms to be implemented if the Settlement is approved address and remediate the specific governance deficiencies underlying the wrongdoing alleged in the Derivative Matters, they confer substantial benefits on Origin. *See Taronis*, 2021 U.S. Dist. LEXIS 42174, at *5-6 (finding that corporate governance reforms "confer[] substantial benefit on the corporation and its shareholders by establishing safeguards in the corporate structure that can prevent future ethical violations."); *In re Davita Healthcare Partners, Inc. Derivative Litig.*, 2015 U.S. Dist. LEXIS 74372 (D. Colo. June 5, 2015) (approving settlement, finding "that the settlement directly addresses the alleged cause of the harms suffered by shareholders, and is fair and adequate, even in the absence of a monetary recovery"); *In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving derivative settlement based on the creation of a Board Compliance Committee – "a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company"); *Unite Nat'l Ret. Fund v. Watts*, 2005 WL 2877899, at *2 (D.N.J. Oct. 28, 2005) (corporate governance benefits designed "to prevent future harm" support settlement).

Moreover, the absence of a monetary recovery does not diminish the value of the benefits to the Company. In *Maher v. Zapata Corp.*, 714 F.2d 436, 466 (5th Cir. 1983), the court found that "a settlement may fairly, reasonably, and adequately serve the best interest of a corporation on whose behalf the derivative action is brought, even though no direct monetary benefits are paid by the defendants to the corporation." The *Maher* court explained "the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor[.]" *Id*. at 461. In addition, because the Company must maintain the Reforms for at least three years, that "should allow them to become embedded in the Company's culture and management routines." Morrissey Decl., ¶ 31. *See Cohn v. Nelson*, 375 F. Supp. 2d 844, 850 (E.D. Mo. 2005) (finding that corporate governance measures that must be in place for no less than three years will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past").

Additionally, the Reforms provide concrete – albeit, not precisely quantifiable – economic value to the Company. If the Settlement is approved, the Reforms provide that the Company will adopt certain cost reduction initiatives, including: (i) the cancellation of all equity awards previously issued to Origin officers for achieving milestones associated with the Origin 2 facility within 60 days of the Effective Date, and ensure that the awards are not offset by other forms of compensation; (ii) that no equity awards will be made to directors for one year in connection with milestones achieved in association with the Origin 2 facility, and ensuring that they are not offset by other forms of compensation; and (iii) the implementation of additional cost-cutting measures by the OEC and management within 60 days of the Effective Date.  Stip., Ex. A, ¶¶ 9.a.i-iii. According to Origin's 2025 proxy statement, Company officers were awarded more than 1.7 million stock shares or restricted stock units in unvested Equity Incentive Plan awards in 2023, with an aggregate value of approximately $2.1 million.[7]

Likewise, the implementation of robust governance can reduce audit-related costs for the Company:

> If a company can demonstrate a strong control environment, then it can reduce the overall scope of its internal-control evaluation. Reduced scope can mean the company need not carry out as many internal tests and the auditor may do less corroborating, resulting in lower compliance costs. (Testing scope is a matter of judgment and perhaps negotiation between the auditor and the company. Indeed, the Public Company Accounting Oversight Board [PCAOB] and the Securities and Exchange Commission encourage auditors to exercise judgment when evaluating financial-reporting controls.).

*See* MacFall Decl., Ex. 4 (Stephen Wagner, Lee Ditmar, *The Unexpected Benefits of Sarbanes-Oxley*, HBR, www.hbr.org (Apr. 2006), p. 2) (insertion in original). In addition, "[o]rganizations with strong governance provide discipline and structure; instill ethical values in employees and train them in proper procedures; and exhibit behavior at the board and executive levels that the rest of the organization will emulate." *Id.*  Indeed, large institutional investors are willing to pay, on

---

[7]    Origin Schedule 14A filed with the SEC on March 24, 2025, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001802457/000180245725000017/orgn-20250324.htm, p. 28 (last accessed Dec. 22, 2025).

average, an 18% premium for the securities of a well-governed company. Morrissey Decl., ¶¶ 81-82. "Investors are more confident in—and actually pay a premium for—a company that is committed to protecting shareholder rights, has frequent and transparent financial reports, and has an independent board providing management oversight." MacFall Decl., Ex. 5, pp. 16-17 (Carlos E. Campos, Roberto E. Newell, and Gregory Wilson, *McKinsey & Company Investor Opinion Survey*, McKinsey & Company (June 2000). Therefore, the results achieved – the adoption, implementation, and maintenance of the Reforms – provide immediate and substantial benefits to the Company which strongly support the reasonableness of the Fee and Expense Amount agreed upon by the Settling Parties.

### 2. The Risks, Expense, Complexity, and Likely Duration of Continued Litigation[8]

Balanced against the immediate and substantial benefits of the Settlement is the risk of continued litigation. *See Officers for Just. v. Civil Service Com.*, 688 F.2d 615, 625 (9th Cir. 1982). Continued litigation would be risky, enormously complex, and costly. Defendants would likely move for dismissal, allowing Plaintiffs the opportunity to amend their complaint. The dispositive pleadings would have to be briefed and argued. In addition, the Derivative Action alleges violations of federal securities laws and breaches of fiduciary duties beginning from at least February of 2023 through August of 2023, warranting significant discovery practice spanning months of important corporate events, disclosures, and operational decisions germane to Plaintiffs' claims. Such discovery would necessarily demand the time, travel, and expense required for the Settling Parties to conduct the depositions of percipient witness, expert designations and discovery, complicated damages analyses, and wide-ranging document productions and review. *See Basaraba v. Greenberg*, 2014 U.S. Dist. LEXIS 207414, at *9 (C.D. Cal. Nov. 10, 2014) (recognizing that the "assessments of damages" in a shareholder derivative action "would be hotly disputed and primarily entail a 'battle of the experts[]'" and that "[j]uries can be very unpredictable in their reactions to

---

[8]    Plaintiffs incorporate by reference herein Section III.C of the Approval Memorandum. *Id*. at 17-18.

PLAINTIFFS' UNOPPOSED MOTION & MPA
FOR AWARD OF AGREED-TO FEE AND
EXPENSE AMOUNT AND SERVICE AWARDS

8

Case No.: 2:25-CV-00777-WBS-JDP

expert testimony and theories."); *see also* MacFall Decl., Ex. 13 (*In re Franklin Wireless Corp. Derivative Litig.*, Case No. 21-CV-1837 BEN (MSB) (S.D. Cal.) verdict sheet reflecting jury's finding of $0.99 and $0 in damages to the company caused by three defendants who breached the fiduciary duties owed to the company).

Following discovery, Defendants would undoubtedly move for summary judgment, which would have to be briefed and argued, followed by a trial which would occupy counsel on both sides and the Court for weeks. MacFall Decl., ¶ 60. Moreover, any judgment favorable to Plaintiffs would likely be the subject of post-trial motions and appeal, which would prolong the case for years with the ultimate outcome uncertain. *Id*. Therefore, there was a significant possibility that, following months, if not years, of litigation, there would be no recovery for the Company. *Id*. Likewise, Plaintiffs' Counsel, who were retained on a contingency fee basis, faced the possibility of recovering no out-of-pocket expenses or not being paid for their time by continuing to prosecute the Derivative Matters. *Id*. The risks of continued litigation, therefore, weigh heavily in support of the approval of the reasonableness of the Fee and Expense Amount. *Id*.

### 3. <u>The Views and Experience of Counsel and the Settling Parties' Arm's-Length Settlement Negotiations</u>

Significant credence and weight are afforded to the opinions and recommendations of experienced counsel who determine that settlement is in the best interest of those affected by its terms. *See Officers for Just*., 688 F.2d at 625. By negotiating the terms of the Settlement and then the Fee and Expense Amount, the Settling Parties, and the counsel for each, have independently considered the Settlement and all agree that it is in the best interest of the Company. *See* Stip., §II, III. In addition, Plaintiffs' Counsel have litigated and favorably resolved scores of shareholder class and derivative actions, including those arising out federal securities violations, misrepresentations concerning disclosure controls and procedures, revenue recognition, and internal controls over financial reporting, and have been appointed as lead counsel by state and federal courts throughout the U.S in similar stockholder derivative litigation. MacFall Decl., ¶ 54. As a product of Plaintiffs' Counsel's experience, they have a unique insight into the legal and factual issues presented and have leveraged that collective experience in negotiating the Settlement. *See* MacFall Decl., Exs. 7-9, 14

(firm resumes of Settling Stockholders' Counsel annexed to their Declarations). Moreover, Defendants were represented by Freshfields US LLP, a leading international law firm with extensive experience in corporate and derivative litigation defense. MacFall Decl., ¶ 54.

In *Taronis*, the court concluded that where the attorneys' fees and expenses to be paid for obtaining the benefits conferred on behalf of the corporation were agreed to when "the proposal occurred after the parties had agreed to the other terms of settlement," they should be approved as "reasonable and the product of arms-length negotiation." 2021 U.S. Dist. LEXIS 42174, at *9-10. The Supreme Court has also endorsed the consensual resolution of attorneys' fees issues as a goal toward which litigants should strive. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee.").

Moreover, unlike fee awards in class actions or cases where plaintiffs' counsel make a contested fee application, this Court is not being called upon to fashion a fee award from scratch. Rather, the Court need only determine whether the amount of the Fee and Expense Amount—agreed to by sophisticated Defendants and insurers represented by experienced counsel in arm's-length negotiations, after the Settlement's substantive terms were determined—falls within the range of reasonableness. *See* Stip., §V, ¶ 4.1 ("The Settling Parties agree that the Settling Stockholders Counsel are **entitled** to a Fee and Expanse Amount, comprised of reasonable attorneys' fees and reimbursement of expenses, in an amount set by the Court but not exceeding $700,000"); MacFall Decl., ¶ 54. Further, unlike class actions, where the diverging interests of plaintiffs' counsel and class members may warrant scrutiny when defendants agree not to oppose fee applications "up to" a certain amount, here the Settling Parties reached agreement on the actual Fee and Expense Amount in negotiations where the real party in interest, Origin, as well as the payor insurers – were represented by counsel with every incentive to negotiate the lowest fee possible. U.S. District Judge Lewis J. Liman's approval in *Allred on behalf of Aclaris Therapeutics, Inc. v. Walker*, 2021 U.S. Dist. LEXIS 236249, at *16 (S.D.N.Y. Dec. 9, 2021), the court's observed that agreed-to attorneys' fees and expenses in a derivative action need not be subjected to rigorous analysis:

The few courts that have considered the issue over the years have held that ***great, and potentially dispositive, weight should be given to a fee amount not to be paid from a common fund negotiated at arm's length between sophisticated counsel after the substantive terms of a settlement have been agreed***. *See Shapiro v. JPMorgan Chase & Co.*, 2014 U.S. Dist. LEXIS 37872, at \*85 (S.D.N.Y. Mar. 24, 2014) ("That the Attorneys' Fee Payment was later separately negotiated weighs in favor of its reasonableness." (citing cases)); *Elias v. Ungar's Food Products, Inc.*, 2013 U.S. Dist. LEXIS 203851, at \*23 (D.N.J. Jan. 28, 2013) (approving "fee agreement [that] was reached only after the parties had agreed on the principle terms of the settlement"); *McAlarnen v. Swift Transp. Co., Inc.*, 2010 U.S. Dist. LEXIS 7877, at \*34 (E.D. Pa. Jan. 29, 2010) (holding that fact that "counsel [did not] engage in arm's length negotiations over fees and costs to be paid by Defendant" until after substantive settlement terms had been agreed weighed in favor of approving fee petition); *In re Schering-Plough/Merck Merger Litigation*, 2010 U.S. Dist. LEXIS 29121, at \*58 (D.N.J. Mar. 26, 2010) (approving fee award that was "the product of mediation conducted before a disinterested and revered member of the legal community"); *Weber v. Government Employees Ins. Co.*, 262 F.R.D. 431, 451 (D.N.J. 2009) (approving award where "the parties' agreement with regard to attorney's fees was the product of arm's length negotiations which did not commence until after the parties had reached agreement in principle of all the terms relating to relief for the Class" (internal quotation marks omitted)).

\*       \*       \*

The fact that the fee is not to be paid from the common fund eliminates the concern, present in many securities class action settlements, that the fees to be awarded to counsel will deplete the funds available to pay injured class members who have released their claims. The fact that the fees are negotiated and agreed only after the substantive settlement terms have been agreed and that the agreement on the substantive settlement terms is not contingent on an agreement on fees addresses the further risk that counsel will trade away the interests of her client in exchange for the defendant to pay her attorneys' fees.

*Id*. at \*16-19.

Here, as in *Allred*, it was only after the Settling Parties reached an agreement on the substantive terms of the Settlement that they began negotiating what they believed to be fair and reasonable compensation for Settling Stockholders' Counsel. MacFall Decl., ¶ 23. Thus, the Settling Parties' conclusion that the agreed upon Fee and Expense Amount is fair and reasonable is entitled to substantial deference, and the Court need not engage the traditional methods used to fashion an award. Therefore, that experienced counsel, based on the benefits conferred by the Settlement, support approval of the negotiated fees and expenses as reasonable, strongly supports the award of the Fee and Expense Amount.

Moreover, fee awards in comparable derivative litigation demonstrates the reasonableness of the Fee and Expense Amount here. *See Nixon-Crenshaw v. Coley*, Case No. 1:18-cv-25289-AHS (S.D. Fla. Sep. 30, 2021), ECF Nos. 68-69  ($2.5 million in attorneys' fees; reforms including, *inter alia*, a new independent director, a lead independent director if Chairman is not independent, review of corporate governance documents, director term limits, annual review of committee assignments, amended code of conduct, enhanced audit committee charter, management disclosure committee policy, enhanced claw-back policy, and director education)[9]; *In re Zuora Derivative Litig.*, Case No. 3:19-cv-05701-SI, (N.D. Cal., Sept. 18, 2023), ECF No. 95  ($2 million in attorneys' fees; reforms include, *inter alia*, partial credit for two independent directors appointed during the pendency of the actions, amendments to the Disclosure Committee Charter, amendments to the Audit Committee Charter, designation of a Chief Commercial Officer, creation of a Chief Technology Officer, Strategic Board update, requirement that Board is 66% independent, maintain reporting hotline, director education); *In re Inovio Pharmaceuticals, Inc. Derivative Litig.*, Lead Case No. 2:20-cv-01962-GJP (E.D. Pa.). ECF No. 21 ($1.175 million in attorneys' fees; reforms include creation of Science Review and Oversight Committee, adoption of Disclosure Committee Policy, enhancements to duties of Audit and Nomination and Corporate Governance Committees, as well as the company's insider trading controls, and providing executive reports to the board).

Likewise, in *Davydov v. Roberts, et al.*, C.A. 2021-0415-SG (Del. Ch. 2021), Vice Chancellor Glasscock of the Delaware Court of Chancery, commenting on the attorneys' fees appropriate for corporate governance reforms much less robust that those provided here, stated "[a]nd I think that the request for a fee of $850,000 based on the corporate governance reforms, the therapeutic reforms that were achieved here, *is modest*." MacFall Decl., Ex. 6 (true and correct copy

---

[9]     Gainey McKenna & Egleston, counsel to Stockholder Yaden, represented the plaintiff in *Nixon-Crenshaw*, and played a central role in the settlement negotiations, including negotiations over the governance reforms implemented as part of the settlement of that stockholder derivative action.

of excerpted pages of Transcript of July 12, 2022 Telephonic Settlement Hearing and Partial Ruling of the Court at 25:24-26:3.[10]

### 4. **Counsel Undertook the Risks of Nonpayment**

In evaluating the reasonableness of a fee award, courts in the Ninth Circuit "must. . . consider the risk of nonpayment." *In re Maxwell Techs., Inc*., 2015 U.S. Dist. LEXIS 189165, *6-7 (S.D. Cal. 2015). The fact that Plaintiffs' Counsel prosecuted this case on a purely contingent basis strongly supports the reasonableness of the requested Fee and Expense Amount. MacFall Decl., ¶ 60. Plaintiffs' Counsel undertook the representation of the Plaintiffs and Origin stockholder Yaden, aware that they would have to devote many hours of hard work to the prosecution of a difficult derivative case without any assurance of receiving any fees or even reimbursement for out-of-pocket expenses. *Id*. Indeed, this policy is especially true in shareholder derivative actions, which are "notoriously difficult and unpredictable." *In re NVIDIA Corp. Derivative Litig*., 2009 U.S. Dist. LEXIS 24973, at *7 (N.D. Cal. Dec. 22, 2008).

Settling Stockholders' Counsels' willingness to take on this risky and challenging litigation justifies the award of the agreed-upon Fee and Expense Amount that was negotiated at arm's-length by the counsel for the Settling Parties only after the material terms of the Settlement were agreed upon. *See Chrysler Corp. v. Dann*, 223 A.2d 384, 389 (Del. 1966) (Chancellor exercised "sound business judgment" by taking "the contingent nature of the litigation" into consideration in fixing the amount of attorneys' fees); *In re Plains Res., Inc. S'holders Litig*., 2005 Del. Ch. LEXIS 12, at *22 (Feb. 4, 2005) (noting public policy "to reward this risk-taking in the interests of shareholders"); *In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F. Supp. 3d 508, 523 (N.D. Cal. 2020), aff'd, 845 F. App'x 563 (9th Cir. 2021) ("The risk that Co-Lead Counsel took in litigation on a contingency basis [] also weighs in favor of a substantial attorney's fee award.").

---

[10] Rigrodsky Law represented the plaintiff in *Davydov*, and played a central role in the settlement negotiations, including negotiations for the governance reforms implemented as part of the settlement of that stockholder derivative action. The assessment of the reforms in *Davydov* is based on that involvement in that litigation. MacFall Decl., ¶ 57, n.8.

### 5. <u>Lodestar Analysis Confirms that the Fee and Expense Amount is Reasonable</u>

A lodestar cross-check further confirms that the reasonableness of the Fee and Expense Amount. While Settling Stockholders' Counsel's fee request is the result of a negotiated agreement achieved with the assistance of the Mediator based on the substantial benefits obtained for Origin, the Court may look to Settling Stockholders' Counsel's collective "lodestar" as a cross-check to assess the reasonableness of the Fee and Expense Amount. *Wells Fargo & Co. S'holder Derivative Litig.*, 445 F. Supp. 3d at 519. This is particularly true in instances like this where calculating attorneys' fees as a percentage of the recovery is difficult because "the relief obtained, corporate governance reforms, 'is not easily monetized.'" *Maxwell Techs., Inc.*, 2015 U.S. Dist. LEXIS 189165 at *10 (*citing In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 941 (9th Cir. 2011).

The lodestar method considers the number of hours counsel expended on a case multiplied by their reasonable hourly rate for those services. *See Vizcaino*, 290 F.3d at 1051. In investigating, prosecuting, and settling the Derivative Matters, Settling Stockholders' Counsel collectively reported a total of 849.34 hours spent in connection with the Derivative Matters. MacFall Decl., ¶ 67. A review of the tasks and hours devoted to the Derivative Matters demonstrates that the work done was reasonably necessary and substantially contributed to Settling Stockholders' Counsel's ability to secure the benefits conferred. *See, e.g.,* MacFall Decl., ¶ 70. Settling Stockholders' Counsel have a total collective lodestar in the Derivative Matters of $680,429.50. *Id*. at ¶ 67. After deducting the unreimbursed expenses of $36,772.71 and the Service Awards totaling $15,000, which will be paid from the Fee and Expense Amount if approved, yields a lodestar multiplier of less than 1.06 of the $700,000 Fee and Expense Award . *Id*., ¶ 68. This is well below the range deemed reasonable in this type of litigation. *See Cohn*, 375 F. Supp. 2d at 862 (approving $2.25 million fee award in corporate governance derivative settlement, with 2.9 multiplier, noting that "[i]n shareholder litigation, courts typically apply a multiplier of 3 to 5"); *In re Fab Universal Corp. S'holder Derivative Litig.*, 148 F. Supp. 3d 277 (S.D.N.Y. 2015) ("In shareholder litigation, courts typically apply a positive multiplier of 3 to 5 to compensate counsel for the risk of contingent representation").

Therefore, a lodestar cross-check demonstrates that Fee and Expense Amount is reasonable and should be approved.

### B.   THE REQUEST FOR THE REIMBURSEMENT OF EXPENSES AND APPROVAL OF THE SERVICE AWARDS SHOULD BE GRANTED

Counsel respectfully submit that the expenses incurred by counsel were reasonably necessary for the prosecution and successful resolution of the Derivative Matters. Settling Stockholders' Counsel incurred aggregate expenses of $36,772.71 in connection with the Derivative Matters. MacFall Decl., ¶ 67. Here, reimbursement will be made as part of the Fee and Expense Amount negotiated by the Settling Parties. Stip., §V, ¶ 4.4. Reimbursement of such expenses, particularly when part of the negotiated fee and expense amount, is generally approved by courts. *See Taronis*, 2021 U.S. Dist. LEXIS 42174, at *10 ("[t]he Court finds that the fees and expenses awarded to Plaintiffs' Counsel by the agreement are reasonable and the product of arms-length negotiation.").

Likewise, Plaintiffs respectfully request that the Court approve nominal Service Awards of $5,000 for each of the two Plaintiffs and for Stockholder Yaden, to be funded from the Fee and Expense Amount, in recognition of their participation and efforts in securing substantial benefits for Origin and its shareholders. MacFall Decl., ¶¶ 76-77; Exs. 10-12 (client declarations attesting to efforts made to prosecute and settle the Derivative Matters); Stip., §V, ¶ 4.4.  Service awards for plaintiffs in derivative actions are routinely awarded. "Such awards are granted to reward the public service performed by [. . .] plaintiffs in contributing to the vitality and enforcement of securities laws." *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (approving a $25,000 incentive award). The proposed awards for the two Plaintiffs and for Stockholder Yaden are well within the range approved by courts as fair and reasonable. *See*, *e.g.*, *Sauby v. City of Fargo*, 2009 U.S. Dist. LEXIS 70270, at *3 (D.N.D. July 16, 2009) (approving $5,000 and $10,000 service awards not "to compensate plaintiffs, but instead serve to encourage people with legitimate claims to pursue the action"). Moreover, because they will be paid from the Fee and Expense Amount, which will be paid by the Defendants' insurers (not the Company), the Service Awards will not reduce the value of the benefits secured for the Company, and therefore

"need not be subjected to intense scrutiny." *In re OSI Sys., Inc. Derivative Litig.*, 2017 U.S. Dist. LEXIS 221033 (C.D. Cal.) (*quoting Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d at 344). Accordingly, Plaintiffs respectfully submit that the Service Awards should be approved.

### III.   CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court: (i) approve the agreed-to Fee and Expense Amount; and (ii) approve the requested Served Awards.

Dated: December 23, 2025                    Respectfully Submitted,

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**

  */s/ Alex J. Tramontano*
    ALEX J. TRAMONTANO

Betsy C. Manifold (182450)
Rachele R. Byrd (190634)
Alex J. Tramontano (276666)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall (admitted *pro hac vice*)
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Tel: (516) 683-3516
tjm@rl-legal.com
sa@rl-legal.com

**KUEHN LAW, PLLC**
Justin A. Kuehn
Molly Brown
53 Hill Street, Suite 605
Southampton, NY 11968
Tel: (833) 672-0814
justin@kuehn.law
molly@kuehn.law

*Co-Lead Counsel for Plaintiffs*

PLAINTIFFS' UNOPPOSED MOTION & MPA   16   Case No.: 2:25-CV-00777-WBS-JDP
FOR AWARD OF AGREED-TO FEE AND
EXPENSE AMOUNT AND SERVICE AWARDS