UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

In re ORIGIN MATERIALS, INC.,
STOCKHOLDER DERIVATIVE LITIGATION

No. 2:25-cv-777 WBS JDP

(Consolidated)

MEMORANDUM AND ORDER RE:
PLAINTIFFS' UNOPPOSED MOTIONS
FOR FINAL APPROVAL OF
DERIVATIVE ACTION SETTLEMENT,
AND FOR APPROVAL OF
ATTORNEYS' FEES, EXPENSES,
AND SERVICE AWARDS

----oo0oo----

Plaintiffs brought this shareholder derivative action against defendant Origin Materials, Inc., alleging violations of section 14(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9). (See Docket No. 1 at 5.) Now before the court are plaintiffs' unopposed motions for final approval of derivative action settlement (Docket No. 36) and for approval of attorneys' fees, expenses, and service awards (Docket No. 37).

1

I.    Background and Proposed Settlement

This is one of four related cases assigned to the undersigned judge that involve claims under the Securities Exchange Act of 1934 against several of the same defendants based on the same subject matter, namely the development and construction of the Origin 2 plant.

Origin, which is headquartered in West Sacramento, California, is a Delaware corporation "specializing in developing and commercializing sustainable materials to replace traditional petroleum-based materials used in various industries."  (Docket No. 25-1 at 10.)  On February 21, 2021, Origin announced a new capital projects plan that involved the construction of "two commercial-style plants": Origin 1 and Origin 2.  (Id.)  "Origin 1 was expected to be operational by the end of 2022.  Origin 2, a significantly larger manufacturing plant, was expected to be operational by mid-2025, and to supply the majority of the Company's products from 2025 until 2027."  (Id.)

Plaintiffs' derivative claims, "arise from allegations that the Individual Defendants breached their fiduciary duties as officers and directors of Origin by making and/or permitting the issuance of materially false and misleading statements" and failures to disclose certain problems in Origin's technological processes and production capabilities.  (Id. at 10—11.)

Specifically, plaintiffs alleged that Origin failed to disclose that: (1) "the Company was experiencing chemical fouling issues 'at every step' of the process of converting CMF to PX at commercial scale"; (2) "fouling issues were causing substantial delays during the FEL 2 phase of the Origin 2 project"; (3) "the

2

Individual Defendants had been planning internally to scale down production of PX at Origin 2 or to shift focus toward another product"; (4) "the Individual Defendants had been planning internally to split construction of Origin 2 into two phases"; (5) "the Company entered into a deal with Avantium N.V. ('Avantium') to produce FDCA at Origin 2 to compensate for the Company's difficulties associated with producing PX at scale"; (6) "contrary to the timeline repeatedly disseminated by the Individual Defendants, Avantium advised that it would take several years before Origin 2 could become operational with respect to production of FDCA"; (7) "despite representations concerning the oversight responsibilities of Board and its committees, neither adequately monitored the accuracy of the public statements issued on behalf of, or concerning, the Company"; (8) "Origin's internal controls over legal compliance, including all laws and regulations governing the content of the Company's public disclosures, were inadequate"; and (9) "as a result, the positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times."  (Id.) According to plaintiffs:

> When it was finally disclosed that Origin 2 would no longer produce PET derived from PX, instead focusing on producing PEF derived from FDCA, and that construction of Origin 2 would be broken up into two phases, with phase 1 expected to be operational by late-2026 or 2027 and phase 2 expected to be operational by 2028, on August 9, 2023, the price of Origin stock declined significantly.

(Id. at 11.)  Thereafter, litigation commenced.

3

The parties propose settlement terms that include nine areas of reform to Origin's corporate governance structures and practices: (1) "Enhancement of the Board's Oversight functions" (Id. at 14); (2) "Creation of a Board Operational Excellence Committee" (Id. at 15); (3) "Amendments to Audit Committee Responsibilities" (Id. at 15–16); (4) "Maintaining a Management Disclosure Committee" (Id. at 16–17); (5) "Creation of a Chief Compliance Officer" (Id. at 17); (6) "Creation of a Management Product and Technology Committee" (Id. at 17–19); (7) "Executive Reports" (Id. at 19); (8) "Cost Reduction Initiatives" (Id. at 19); and (9) "Enhancements to the Whistleblower Policy" (Id. at 20–21).

According to plaintiffs, "the Reforms directly target the alleged governance deficiencies that enabled the wrongdoing alleged in the Derivative Matters" and, if approved, they "will not only prevent recurrence of the wrongs alleged . . . but will . . . generally strengthen Origin's corporate governance, oversight, and internal controls." (Id. at 13.)  Moreover, Origin agrees to "adopt, implement, and maintain the Reforms within sixty days of an Order granting final approval of the settlement" and has further agreed to "maintain the Reforms for at least three (3) years."  (Id.)

II.  Final Settlement Approval

Federal Rule of Civil Procedure 23.1 provides that a shareholder "derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23.1(c).  "Rule 23 requires courts to employ a two-step process in evaluating a class action or derivative action

settlement."  In re Wells Fargo & Co. Shareholder Derivative Litig., No. 16-cv-05541-JST, 2019 WL 13020734, at *4 (N.D. Cal. May 14, 2019).  Under Rule 23(e)(2), the court at step one "must make a preliminary determination that the settlement is fair, reasonable, and adequate."  Id. (internal citation and quotations omitted).  Then, at step two, the court may approve the settlement only if it is found to be "fundamentally fair, adequate, and reasonable."  In re Hewlett-Packard Co. S'holder Derivative Litig., No. 3:12-cv-06003-CRB, 2015 WL 1153864, at *3 (N.D. Cal. Mar. 13, 2015) (internal citation and quotations omitted).  Having determined at the preliminary approval stage that the proposed settlement was "within the range of possible approval."  In re Tableware Antitrust Litig., 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (internal citation and quotations omitted); see In re Wells Fargo, 2019 WL 13020734, at *4, the court now proceeds to step two.

Courts consider a broad range of factors when evaluating the "fairness, reasonableness, and adequacy" of a proposed settlement in the context of a derivative action at step two.  In re Lyft, Inc. Derivative Litig., No. 20-cv-09257-HSG, 2024 WL 4505474, at *4 (N.D. Cal. Oct. 16, 2024).  Such factors include: (1) "the strength of plaintiffs' case"; (2) "the risk, expense, complexity, and likely duration of further litigation"; (3) "the risk of maintaining class action status throughout the trial"; (4) "the amount offered in settlement"; (5) "the extent of discovery completed, and the stage of the proceedings"; (6) "the experience and views of counsel"; (7) "the presence of a governmental participant"; and (8) "the reaction of the class

members to the proposed settlement." Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco, 688 F.2d 615, 625 (9th Cir. 1982).

Importantly, the court must ensure that the settlement is not "the product of fraud or overreaching by, or collusion between, the negotiating parties." In re Hewlett-Packard, 2015 WL 1153864, at *3 (internal citation and quotation omitted); see also Lloyd v. Gupta, No. 15-cv-04183-MEJ, 2016 WL 3951652, at *4 (N.D. Cal. July 22, 2016) (internal citation and quotations omitted) (explaining that a court will take into account whether "the settlement is the result of arm's-length negotiations in which plaintiffs' counsel has effectively represented the interest of the shareholder class, and whether the substantive terms of the settlement are in the interests of [the company] and its shareholders relative to the likely rewards of litigation.").

A.    Fairness, Adequacy, and Reasonableness of Settlement

"The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." In re Apple Computer, Inc. Derivative Litig., No. 06-cv-4128-JF-(HRL), 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008) (internal citation and quotation omitted); see also Mego Financial Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000).

Here, the settlement "provides Origin and its shareholders with the substantial, immediate, and lasting benefits of the reforms which directly remediate the governance deficiencies that caused and/or enabled the alleged wrongdoing

6

and will prevent the recurrence of similar misconduct." (Docket No. 36 at 18.) The settlement consists primarily of corporate governance reforms that the parties agree are designed to achieve the following ends:

    (1)    "[I]mprove Origin's risk oversight functions through updates to the Board's oversight functions;"

    (2)    "[E]nsure that the Company's manufacturing capabilities and processes conform to its target production goals as expressed in public statements;"

    (3)    "[E]nhance the Audit Committees' risk oversight responsibilities and capabilities;"

    (4)    "[E]nsure that the Company's significant public statements are reviewed for accuracy, integrity, and compliance with applicable laws and regulations as well as GAAP and non-GAAP requirements, protocols, and procedures through the maintenance of a management-level Disclosure Committee;"

    (5)    "[E]nhance oversight of the Company's corporate governance policies through the creation of a CCO position;"

    (6)    "[I]mprove oversight of key technological initiatives through the creation of a management-level Product and Technology Committee;"

    (7)    "[P]rovide regular executive reports to the Board regarding the Company's financial condition and business prospects;"

    (8)    "[M]inimize costs to the Company in the near term through cost reduction initiatives; and"

    (9)    "[P]rotect and incentivize employees with legitimate concerns regarding the Company's management to voice

7

their concerns through updates to the Company's Whistleblower Policy."

(Docket No. 25-1 at 24.)  "[C]ourts have recognized that corporate governance reforms ... provide valuable benefits to public companies."  In re NVIDIA Corp. Derivative Litig., No. 06-cv-06110-SBA-(JCS), 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008) (internal citation and quotations omitted).  Together, these reforms "significantly strengthen the Board's decision-making process, risk management, and oversight by ensuring that the Board receives detailed financial and operational information from management before it approves the issuance of material financial and operational public statements."  (Docket No. 36 at 18—19; see also Docket No. 37 at 9.)

The settlement here also fixes the proposed corporate governance reforms in place for three years.  (Docket No. 37 at 8).  In Cohn v. Nelson, the court found that corporate governance measures included in a proposed settlement, when held in place for at least three years, tend to "provide meaningful ways of avoiding the problems [the company] experienced in the recent past."  375 F.Supp.2d 844, 850 (E.D. Mo. 2005).  Courts have also found that a "three-year commitment should enhance consumer, investor, and employee trust in [the Corporation's] corporate governance."  In re Lyft, 2024 WL 4505474, at *4.  Moreover, "the Board, including its independent directors, advised by counsel and acting by unanimous resolution and in the exercise of its business judgment, acknowledges and agrees that the Settlement, and the Reforms it provides, confer substantial benefits upon Origin and its stockholders."  (Docket No. 36 at 19.)

Additionally, "without a settlement, Plaintiffs face[ ] the prospect of additional or collateral litigation ... further prolonging any resolution beneficial to [Origin]." In re Wells Fargo, 2019 WL 13020734, at *6; see In re Apple Computer, Inc., 2008 WL 4820784, at *3 (internal citation and quotations omitted) ("[T]he risk, expense, complexity, and likely duration of further litigation are additional factors that should be considered in determining the fairness of a proposed settlement.").

Plaintiffs here acknowledge "the significant risk that continued litigation may not lead to any recovery for Origin." (Docket No. 25-1 at 25); see Basaraba v. Greenberg, No. 13-cv-5061-PSG-(SHX), 2014 WL 12591677, at *3 (C.D. Cal. Nov. 10, 2014) ("In the context of shareholder derivative litigation, even the strongest cases have a very low likelihood of success due to the myriad legal, procedural, and discovery protections afforded director and officer defendants."); see also In re Pac. Enter. Sec. Litig., 47 F.3d 373, 378 (9th Cir. 1995) ("[T]he odds of winning a derivative lawsuit [are] extremely small.") They argue that "the uncertainties of further litigation demonstrate that the proposed Settlement is within the range of approval and warrants Court approval." (Docket No. 25-1 at 25.)

In particular, plaintiffs recognize the difficulties imposed by the heightened pleading standards in Rule 23.1 and state that they were "mindful of the inherent challenges of establishing demand futility." (Id.; see also Docket No. 36 at 21); see In re Fab Universal Corp. S'holder Derivative Litig., 148 F. Supp. 3d 277, 281-82 (S.D.N.Y. 2015) ("The doctrine of demand futility, the business judgment rule, and the generally

uncertain prospect of establishing a breach of fiduciary duties combine to make shareholder derivative suits an infamously uphill battle for plaintiffs."); see also Kamen v. Kemper Fin. Servs. Inc., 500 U.S. 90, 96 (1991) (holding that "extraordinary conditions" are required in order for a plaintiff to establish demand futility.").

According to plaintiffs' counsel, "[h]ad Plaintiffs continued to litigate, there was a risk that they would not have prevailed against a motion challenging pleading sufficiency under Fed. R. Ci, P. 23.1." (Docket No. 36 at 21.)   And "[t]o establish damages at trial, Settling Stockholders would have to prove, inter alia, that the claims raised in the Derivative Matters actually caused Origin to suffer non-exculpated damages and that the Individual Defendants, as a matter of law, could be held liable for those damages." (Id. at 22.)

Similarly, settlement at this stage of the proceedings allows both sides to avoid the lengthy and costly process of full discovery as would be required were the litigation to continue. (Id. at 22—23.)  "Settling Stockholders have a strong grasp of the underlying facts and alleged misconduct, as well as the strengths and weaknesses of their claims, to support their opinion that the Settlement is fair, reasonable, and adequate. For these reasons too, the Settlement should be finally approved." (Id. at 23.)  This is because "Settling Stockholders' Counsel's investigation and negotiations were sufficient to critically evaluate the Derivative Matters and the propriety of settling at this stage." (Id.)  As part of its investigation,

10

> Settling Stockholders' Counsel had, *inter alia*: (i) reviewed and analyzed Origin's press releases, public statements, and filings with the SEC; (ii) prepared the complaints and demands in the underlying Derivative Matters; (iii) conducted research into the Company's corporate governance structure in connection with settlement efforts; (iv) exchanged extensive written settlement demands with Defendants' Counsel; (v) obtained confidential, non-public information about Origin and its business during settlement negotiations; and (vi) negotiated the material terms of the Settlement.

(Id.)

The settlement bypasses these hurdles, aiming to ensure that Origin does not miss out on the opportunity to receive a benefit. See In re AOL Time Warner S'holder Derivative Litig., No. 02-cv-6302-(SWK), 2006 WL 2572114, at *5 (S.D.N.Y. Sept. 6, 2006) ("Termination of the litigation at this stage of the proceedings 'obviate[es] the expenditure of any future time and expense in connection with this action,' and will allow the Company to direct its full attention to its substantive business.") (citation omitted).

B.    Views of Counsel and Shareholder Reactions

Further factors weighing in favor of final settlement approval are the views of experienced counsel and the reaction of shareholders.

"'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004) (citing In re Painewebber Ltd. P'ships Litig., 171 F.R.D. 104, 125 (S.D.N.Y.1997)); see also Pac. Enters. Sec. Litig., 47 F.3d at

11

378 ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation."). Therefore, "the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." Nat'l Rural Telecommunications Coop., 221 F.R.D. at 528 (citing Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir.1977)); see also Griffin v. Consol. Commc'ns, No. 2:21-cv-885-WBS-KJN, 2023 WL 3853643, at *4 (E.D. Cal. June 6, 2023) (Shubb, J.) ("Given counsel's representation that the settlement reached was the product of arms-length bargaining following extensive informal discovery and with the help of an experienced mediator, this factor weighs in favor of final approval."); see La Fleur v. Med. Mgmt. Int'l, Inc., No. 5:13-cv-00398, 2014 WL 2967475, at *4 (N.D. Cal. June 25, 2014) ("Settlements reached with the help of a mediator are likely non-collusive."). Importantly, here experienced counsel on both sides agree that "the Settlement is in its best interests and confers substantial benefits to the Company." (Docket No. 36 at 24.)

Likewise, "[t]he reaction of shareholders also factors into assessing the fairness of a settlement." In re Pinterest Derivative Litig., No. 20-cv-08331-WHA, 2022 WL 2079712, at *1 (N.D. Cal. June 9, 2022). Consequently, "because potential buyers of [the Corporation's] stock likely will view [the] reforms as an additional reason to purchase the stock, this three-year period should confer financial benefits to [the Corporation]." In re Lyft, 2024 WL 4505474, at *4 (internal citation and quotation marks omitted); see also In re Rambus Inc.

Derivative Litig., No. 06-cv-3513-JF-(HRL), 2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ("The Settlement provides long term remedial measures that are specifically designed to protect the shareholders."). According to counsel, "[t]o date, neither Settling Stockholders' Counsel nor Defendants' Counsel have received any objections to the Settlement." (Docket No. 36 at 24.) They argue that "[t]he lack of objections weighs heavily in favor of final approval." (Id.) The court is inclined to agree.

The court is therefore satisfied that the settlement is "fundamentally fair, adequate, and reasonable." In re Hewlett-Packard Co. S'holder Derivative Litig., 2015 WL 1153864, at *3.

III. Motion for Approval of Attorneys' Fees, Expenses, and Service Awards

Federal Rule of Civil Procedure 23(h) provides, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). If a negotiated settlement includes an award of attorneys' fees, that fee award must be evaluated in the overall context of the settlement. See Knisley v. Network Assocs., 312 F.3d 1123, 1126 (9th Cir. 2002); Monterrubio v. Best Buy Stores, L.P., 291 F.R.D. 443, 455 (E.D. Cal. 2013) (England, J.). The court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 941 (9th Cir. 2011) ("The reasonableness of any fee award must be considered against the backdrop of the 'American Rule,' which provides that courts generally are without discretion to

award attorneys' fees to a prevailing plaintiff unless (1) fee-shifting is expressly authorized by the governing statute; (2) the opponents acted in bad faith or willfully violated a court order; or (3) 'the successful litigants have created a common fund for recovery or extended a substantial benefit to a class.'").  In determining the reasonableness of a motion for attorneys' fees, the court will consider, "(1) the results achieved, (2) the risk of litigation, (3) the skill required and quality of work, and (4) the contingent nature of the fee and the financial burden carried by the Settling Stockholders' Counsel." (Docket No. 37 t 6—7.)

A.    Fees and Expenses

Courts are required to "ensure that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties."  In re NVIDIA, 2008 WL 5382544, at *2 (internal citation and quotations omitted). However, "[a]n initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's length bargaining."  Urena v. Cent. California Almond Growers Assn., No. 1:18-cv-517-NONE-EPG, 2020 WL 3483280, at *11 (E.D. Cal. June 26, 2020), report and recommendation adopted, No. 1:18-cv-517-NONE-EPG, 2020 WL 4593824 (E.D. Cal. Aug. 11, 2020) (quotation omitted).  Additionally, "[t]he involvement of counsel with significant experience in derivative litigation, who appear 'on behalf of all parties,' weighs in favor of a non-collusive settlement."  In re Lyft, 2024 WL 4505474, at *5 (citation omitted).

Here, "Defendants were represented by esteemed counsel

14

from Freshfields US LLP." (Docket No. 25-1 at 28.) Plaintiffs were likewise represented by counsel with significant experience in derivative litigation. (Docket No. 25-2 at 87—130.) Plaintiffs assert that "counsel on both sides possessed a firm understanding of the strengths and weaknesses of the claims and defenses in the Derivative Matters." (Docket No. 25-1 at 28—29 ("Specifically, prior to the Settlement, Settling Stockholders' Counsel was well-informed about the legal and factual issues the litigation posed as they conducted extensive research and investigation into the claims and underlying issues in their investigation.").) This included, among other things, significant research and investigation, preparation of a settlement demand, "extensive settlement discussions with [opposing] counsel," "the exchange of corporate governance reform proposals and counteroffers," and "negotiating and drafting the term sheet and subsequent settlement documentation for presentment to the Court." (Id. at 29; see also Docket No. 38 at 23.)

Here counsel assert that "[o]nly after reaching an agreement in principle on the Reforms did the Settling Parties discuss attorneys' fees." (Docket No. 25-1 at 29.) Plaintiffs argue that the proposed "Fee and Expense Amount of $700,000.00 . . . represents a fair, reasonable, beneficial, and practical resolution of highly uncertain litigation," and that the terms of the settlement "fairly account for the risks and potential rewards of the claims being settled." (Id.) "[T]he Parties agree that the Settlement 'confers substantial benefits upon the Company and its stockholders and that the adoption,

implementation, and maintenance of the Reforms are in the best interests of the Company and its stockholders." (Id.)

Further, like complex class actions, this case presented both counsel and plaintiffs with a risk of no recovery at all. (See Docket No. 38 at 21—22.) Plaintiff's counsel took on this matter on a contingency basis. (Id.) The nature of contingency work inherently carries risks that counsel will sometimes recovers very little to nothing at all, even for cases that may be meritorious. See Kimbo v. MXD Group, Inc., No. 2:19-cv-00166 WBS KNJ, 2021 WL 492493, at *7 (E.D. Cal. Feb. 10, 2021). Plaintiffs' counsel argues, and counsel for defendants agree, that, in light of the result obtained and substantial risk taken in this case, a fee of $700,000.00, as requested here, is reasonable.

The Ninth Circuit has established 25% of the fund as the "benchmark" award that should be given in common fund cases. Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990). As this court has explained, "a review of California cases . . . reveals that courts usually award attorneys' fees in the 30-40% range in wage and hour class actions that result in recovery of a common fun[d] under $10 million." Watson v. Tennant Co., No. 2:18-cv-02462 WBS DB, 2020 WL 5502318, at *7 (E.D. Cal. Sep. 11, 2020) (awarding 33.33% of settlement fund); see also Osegueda v. N. Cal. Inalliance, No. 18-cv-00835 WBS EFB, 2020 WL 4194055, at *16 (E.D. Cal. July 21, 2020) (same). Given that the requested fee is in line with the typical practice in the Ninth Circuit and in this district, the court agrees that plaintiff's counsel's requested percentage of

the common fund is reasonable.

"Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award." Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050 (9th Cir. 2002).

Here, a lodestar cross-check confirms the reasonableness of the requested award. Counsel represent that they have together dedicated 849.34 hours of work to these cases. (See Docket No. 38 at 22.) And counsel from the respective firms state that their customary hourly rates in actions such as this range from $200.00 to $1,000.00. (Compare Docket No. 38 at 22, with Docket No. 38-7 at 4, Docket No. 38-8 at 7, and Docket No. 38-9 at 4.) The firms specialize in shareholder derivative action cases, and counsel represents that comparable hourly rates have been approved by multiple federal and state courts in California. (See e.g., Docket No. 37 at 14—16.) For purposes of the lodestar calculation, the court will apply the rate at the lower end of the ranges provided by counsel.[1] Based on 849.34 hours billed at an average hourly rate of approximately $250.39, the lodestar figure is $212,662.00.[2] While this figure is nearly

---

[1] The court's calculations are as follows: (1) Rigrodsky Law, P.A. with 256.75 hours at a rate of $200.00 per hour for a firm subtotal of $51,350.00 (Docket No. 38 at 24); (2) Kuehn Law, PLLC with 218.49 hours at a rate of $350.00 per hour for a firm total of $76,471.50 (Docket No. 38-7 at 4); (3) Gainey McKenna & Egleston with 240.50 hours at a rate of $225.00 per hour for a firm total of $54,112.50 (Docket No. 38-8 at 7); and (4) Wolf Haldenstein Adler Freeman & Herz LLP with 133.60 hours at a rate of $230.00 per hour for a firm total of $30,728.00 (Docket No. 38-9 at 4).

[2] This loadstar figure is the sum of the four firm-specific loadstar calculations. See supra note 1.

17

one third the $700,000.00 total award requested and translates to a loadstar cross-check multiplier of approximately 3.29, which is comparable to the 3.65 multiplier applied in Vizcaino.  Cf. Vizcaino, 290 F.3d at 1051; see also Cohn, 375 F. Supp. 2d at 862 ("In shareholder litigation, courts typically apply a multiplier of 3 to 5."); see also In re Fab Universal Corp. S'holder Derivative Littig., 148 F. Supp. 3d 277 (S.D.N.Y. 2015) ("In shareholder litigation, courts typically apply a positive multiplier of 3 to 5 to compensate counsel for the risk of contingent representation").  The court finds that class counsel's request for attorneys' fees is reasonable.

Likewise with expenses, "[t]here is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund."  In re Heritage Bond Litig., No. 02-cv-1475, 2005 WL 1594403, at *23 (C.D. Cal. June 10, 2005).  Here, the parties agreed that plaintiffs' counsel shall be entitled to recover reasonable, documented litigation costs.  (See Docket No. 38 at 14—16.)  Counsels' litigation expenses and costs currently total approximately $36,772.71.  (See Docket No. 38 at 22.)  The court finds that class counsel's request for reimbursement of litigation expenses in the amount of $36,772.71 is reasonable.

This suggests, therefore, that the total award amount is reasonable.

B.    Service Awards

"Incentive awards are fairly typical in class action cases."  Rodriguez, 563 F.3d at 958.  "[They] are intended to compensate class representatives for work done on behalf of the

class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." Id. at 958-59.

Nevertheless, the Ninth Circuit has cautioned that "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives . . .." Radcliffe v. Experian Info. Solutions, Inc., 715 F.3d 1157, 1164 (9th Cir. 2013). In assessing the reasonableness of incentive payments, the court should consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions" and "the amount of time and effort the plaintiff expended in pursuing the litigation." Staton, 327 F.3d at 977 (citation omitted). The court must balance "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." Id.

In the Ninth Circuit, an incentive award of $5,000.00 is presumptively reasonable. Davis v. Brown Shoe Co., Inc., No. 1:13-cv-01211 LJO BAM, 2015 WL 6697929, at *11 (E.D. Cal. Nov. 3, 2015) (citing Harris v. Vector Marketing Corp., No. 08-cv-5198 EMC, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) (collecting cases)).

Plaintiffs seek a $5,000.00 incentive award for each of the two plaintiffs and for Stockholder Yaden, "to be funded from the Fee and Expense Amount, in recognition of their participation and efforts in securing substantial benefits for Origin and its

shareholders." (Docket No. 37 at 19.) Plaintiffs' efforts included "reviewing and authorizing the service of the Demand, participating in numerous updates, remaining available to consult on the ultimate strategy which achieved the instant proposed Settlement, and approving the terms and details of the proposed Settlement." (Docket No. 38-8 at 10.) Counsel represents that plaintiffs' efforts constituted active involvement in prosecuting this action. (Id.) Considering plaintiffs' efforts and the risks incurred in bringing this action, the court finds the requested incentive awards to be reasonable and will approve the awards.

Accordingly, the court finds the above requested figures to be reasonable and will grant counsel's unopposed motion for attorneys' fees, expenses, and service awards totaling $700,000.00.

IV. Conclusion

IT IS THEREFORE ORDERED that plaintiffs' unopposed motions for final approval of derivative settlement (Docket No. 36) and for approval of attorneys' fees, expenses, and service awards (Docket No. 37) be, and the same hereby are, GRANTED.

IT IS FURTHER ORDERED THAT:

(1) This order and final judgment incorporates by reference the definitions in the Stipulation, and all terms used herein shall have the same meanings as set forth in the Stipulation, unless otherwise set forth herein.

(2) This court has jurisdiction over the subject matter of this case, including all matters necessary to effectuate the settlement, and over all the Settling Parties.

(3)   Based on evidence submitted, the court finds that notice of the settlement was published and disseminated in accordance with this court's Preliminary Approval Order. (Compare Docket No. 32, with Docket No. 40.)   This court further finds that the forms and contents of the notice, as previously preliminarily approved by the court, complied with the requirements of Federal Rule of Civil Procedure 23.1, satisfied the requirements of due process of the U.S. Constitution, and constituted due and sufficient notice of the matters set forth therein.

(4)   The court finds that the terms of the stipulation and settlement are fair, reasonable, and adequate as to each of the parties, and hereby finally approves the stipulation and settlement in all respects and orders the parties to perform its terms to the extent the Parties have not already done so.

(5)   Pursuant to entry of this order and final judgment, the action and all claims contained therein against defendants, as well as all of defendants' released claims against each of the released defendant parties, are hereby dismissed with prejudice.   As among the settling stockholders and defendants, the parties are to bear their own costs, except as otherwise provided in the stipulation.

(6)   Upon the date of this order, the settling stockholders (acting on their own behalf and derivatively on behalf of Origin), Origin, and any person acting derivatively on behalf of Origin shall be deemed to have, and by operation of the order and final judgment to be rendered by the court shall have, fully, finally, and forever released, relinquished, discharged

21

and dismissed with prejudice the released stockholder claims (including unknown claims) against defendants, regardless of the jurisdiction in which such claims were or could have been alleged or where the claims had impact.

(7)   Upon the date of this order, the settling stockholders (acting on their own behalf and, in some cases, derivatively on behalf of Origin), Origin, and any person acting derivatively on behalf of Origin, shall be forever barred and enjoined from asserting, commencing, instituting, or prosecuting any of the released stockholder claims against any defendants, regardless of the jurisdiction in which such claims were or could have been alleged or where the claims had impact.

(8)   Upon the date of this order, each of the individual defendants and Origin shall be deemed to have, and by operation of the order and final judgment shall have, fully, finally, and forever released, relinquished, and discharged the released defendant claims (including unknown claims) against the settling stockholders, and shall be forever barred and enjoined from asserting any released defendant claims against any settling stockholders.

(9)   During the course of the derivative matters, all settling parties and their respective counsel at all times complied with the requirements of Federal Rule of Civil Procedure 11, and all other similar rules, laws, or statutes.

(10) The court hereby approves the $700,000.00 requested for attorneys' fees, expenses, and service awards.  The court further finds that such amounts and awards are fair and reasonable.

(11) Neither the stipulation (including any exhibits attached thereto) nor the settlement, nor any act or omission taken in connection with this stipulation or the settlement, is intended or shall be deemed to be a presumption, concession or admission by:

a. any of defendants as to the validity of any claims, causes of action or other issues that were or could have been raised in the derivative matters or in any other litigation, or to be evidence of or constitute an admission of wrongdoing or liability by any of them, and each of them expressly denies any such wrongdoing or liability; or

b. settling stockholders as to the lack of merit of any claim or the validity of any defense.

(12) Without affecting the finality of this order and final judgment in any way, this court hereby retains continuing jurisdiction with respect to implementation and enforcement of the terms of the stipulation and settlement, except as otherwise provided in the stipulation.

(13) This order and final judgment is a final judgment and shall be entered forthwith by the Clerk in accordance with Federal Rule of Civil Procedure 58 and all other similar laws.

IT IS SO ORDERED.

Dated: January 21, 2026

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

23